226 So.2d 393 (1969)
JUNIOR FOOD STORES OF WEST FLORIDA, INC., a Florida Corporation, Petitioner,
v.
JR., FOOD STORES, INC., a Florida Corporation, Respondent.
No. 38089.
Supreme Court of Florida.
September 17, 1969.
Rehearing Denied October 2, 1969.
*394 Barrow & Holley, Crestview, and Douglass & Booth, Tallahassee, for petitioner.
William E. Harris, of Davenport, Johnston & Harris, Panama City, for respondent.

REHEARING
CARLTON, Justice.
This is a common law tradename protection case. Petitioner and respondent operate similar chains of small neighborhood convenience grocery stores throughout the Panhandle region of West Florida. Circuit Court, Bay County, enjoined petitioner from using a tradename and outdoor identification sign design similar to those of the respondent. The District Court of Appeal, First District, affirmed, 215 So.2d 56 (1968). We granted certiorari because of conflict between the District Court's decision and two cases arising out of the Second District, Tampa Wholesale Co. v. Foodtown, U.S.A., 166 So.2d 711 (2nd D.C.A.Fla. 1964), and Stagg Shop of Miami, Inc. v. Moss, 120 So.2d 39 (2nd D.C.A.Fla. 1960).
Respondent was incorporated in June 1961. In August of that year, it registered the tradename "Jr. Food Store," along with a design for its outdoor identification signs, with the Secretary of State under auspices of Fla.Laws 1957, ch. 57-212 (repealed 1967), now Fla. Stat. ch. 495, F.S.A. The design consisted of the words "Food Store" separated by a large rendition of the abbreviation "Jr.", and a simplified picture of a young boy's face. Respondent opened three stores in Bay County under this sign. Shortly afterwards, Jitney Jungle, a large food store chain, entered into a franchise agreement with respondent, and, as a condition of this franchise, respondent changed the names of its three stores to "Jitney Junior."
Petitioner was also incorporated in 1961. It, too, began business under a Jitney Jungle franchise, and thus its stores, which were located in Okaloosa, Jackson and Santa Rosa Counties, also operated under the "Jitney Junior" banner.
Neither litigant remained for long under franchise. Respondent was first to resume independent operation, and when it did, it put up its own signs again and also began an expansion program. Petitioner followed a similar course, but prior to doing so, it took a step which ultimately led to this litigation. Petitioner, just prior to the expiration of its franchise, registered with the Secretary of State the tradename "Jr. Food Stores of West Florida, Inc." along with a sign design generally similar to that of the respondent. Both signs emphasized the abbreviation "Jr." and both featured a boy's face, although the faces depicted were considerably different. The litigants have stipulated that their tradenames and signs are similar enough to cause confusion if used in the same location.
Initially, the litigants' stores were far apart. At the time of their respective franchise expirations, respondent operated *395 only in Bay County, while petitioner had stores in Okaloosa, Jackson and Santa Rosa Counties. Subsequent expansion, however, brought them into close proximity in a qualified sense. Petitioner's expansion occurred primarily within Okaloosa County and only one store was added in a new county, Holmes. Respondent's expansion was more energetic. The Chancellor noted in his Final Order that respondent had one or more stores in Bay (its initial locale), Gulf, Franklin, Washington, Calhoun, Jefferson, Escambia, Jackson and Okaloosa Counties. It should be noted that the pattern of growth was from respondent towards petitioner, that is, respondent's stores were placed around the areas served by the petitioner and not vice versa. In the two counties in which both have stores, Jackson and Okaloosa, petitioner was established first. We have said that the litigants are in close proximity in a qualified sense because the closest they come to direct competition is in Niceville, Okaloosa County, where they are located in separate neighborhoods; Niceville is the only area where both do business.
Respondent's complaint was filed approximately two years after it was first aware that petitioner was using the word "Junior" as part of its store identification signs. The record indicates that respondent's officers had informal conversations with persons connected with petitioner, on at least two occasions, prior to the filing of the complaint, during which petitioner was informally requested to stop using the name. When petitioner persisted in using the "Jr. Food Stores of West Florida, Inc." tradename on its signs, and as competition loomed on the horizon as a steadily increasing probability, respondent filed its action in circuit court seeking to have petitioner enjoined from making any use of the words "Jr. Food Store", or any imitation thereof, and from using an outdoor sign design similar to respondent's.
The Judge, sitting as Chancellor, found that: (1) The litigants' tradenames and signs were similar; (2) this similarity resulted in confusion as to the ownership of stores in each chain; (3) this confusion would continue into the future; and (4) respondent had a prior right to the tradename and sign design by virtue of its prior registration. Accordingly, the Chancellor issued the following order:
"ORDERED AND ADJUDGED that Plaintiff, JR. FOOD STORES, INC. is the lawful owner of the trademark and/or tradename "JR. FOOD STORE" along with the design of said words and the picture of a boy as filed in the Office of the Secretary of State, State of Florida, and as such is entitled to the exclusive use of same as set forth under Chapter 495, Florida Statutes.
"IT IS FURTHER ORDERED AND ADJUDGED that Defendant, JUNIOR FOOD STORES OF WEST FLORIDA, INC. be and it is hereby enjoined from using or displaying on any of its retail grocery stores, or in its advertising of any kind, the use of the words "JR. FOOD STORE" or any imitation thereof, and further enjoined from the use of any sign or advertising or other matter using said words "JR. FOOD STORE", together with the picture of a boy such as that which Plaintiff had registered with the Secretary of State, State of Florida."
Upon petitioner's appeal, the District Court held only that it would not substitute its judgment for that of the Chancellor when sufficient evidence supported his findings and no erroneous application of law was apparent.
We have set out the facts of this case at length because we disagree with the District Court. It is our opinion that the Chancellor did not have sufficient evidence upon which to base his judgment and also that he did make an erroneous application of the law.
First, we cannot agree with the Chancellor that, because of its prior registration of its tradename and sign design, *396 respondent is "entitled to the exclusive use of same as set forth under Chapter 495, Florida Statutes." A careful reading of Fla.Laws 1957, ch. 57-212, which is the version of Fla. Stat. ch. 495, F.S.A. applicable to this case, does not disclose any provision for the "exclusive use" of a tradename. The chapter appears to be concerned solely with the registration and regulation of trademarks, not tradenames. There is a fundamental distinction between the two, and distinctly different legal principles govern their protection. A tradename is descriptive of a manufacturer or dealer and applies to a business and its goodwill, whereas a trademark, in a technical sense, is applicable only to vendable commodities. For discussion of this difference, see Children's Bootery v. Sutker, 91 Fla. 60, 107 So. 345, 44 A.L.R. 698 (1926); Vandenburgh Trademark Law & Procedure § 121(e) (2nd ed. 1968); 52 Am.Jur. Trademarks, Tradenames & Trade Practices § 3 (1944). While it is true that a tradename may be used as a trademark under certain circumstances, we do not have that situation here and so we are not concerned with the possibility.
The true effect of respondent's registration of its tradename and sign design was not to invest it instantaneously with a right to "exclusive use", but rather to establish for respondent the basis for invoking common law tradename protection principles which are predicated upon a prior use of a tradename as against the subsequent use by another. It was not until after the initiation of this litigation that the Legislature revised Chapter 495 so as to provide for statutory protection of tradenames. See, for example, Fla.Stats. §§ 495.011(6) and 495.151, F.S.A. of the current revision, and note that they are without statutory antecedent in Fla.Laws 1957, ch. 57-212. Note also that Fla. Stat. § 495.171, F.S.A. limits the effective date of the revision so as to make it inapplicable to this case. By predicating his order upon Chapter 495, the Chancellor misapplied the applicable law and the District Court erred by not correcting the situation.
Under the common law, the universal rule governing tradename protection is that protection will be extended to the first appropriator of a name, within the territorial scope of its business, against subsequent use of the same or a similar name by another. See Florida Ventilated Awning Co. Inc. v. Dickson, 67 So.2d 215 (Fla. 1953) and related decision at 67 So.2d 218 (Fla. 1953); First Born Church of the Living God v. The First Born Church, 156 Fla. 78, 22 So.2d 452 (1945); Dye Tradenames: The Common-Law Right of a Corporation to the Protection of its Name, 2 U.Fla.L.Rev. 156 (1949). There can be no question about the fact that respondent was first to use the tradename "Jr. Food Store." Respondent's prior registration establishes that. However, prior registration does not supply the answer to the question next to be asked: "What is the territorial scope of the business to be protected?"
Two elements need to be considered in regard to this question: first, what is the territorial scope of respondent's business; second, at what point in time are the limits to this scope to be determined. In answer to the first question, we think it is obvious that respondent's zone of territorial protection is determined by the nature of respondent's business. Here we are concerned with small neighborhood convenience grocery stores. As was said in the strikingly similar case of National Grocery Co. v. National Stores Corp., 95 N.J. Eq. 588, 123 A. 740, 742 (1924):
"Obviously, by force of the definition of the kind of business in which the parties are engaged, each store must draw its trade from a very small surrounding territory, because customers obliged to pay cash and carry away their purchases will not patronize a store unless within their immediate neighborhood."
Since respondent's stores have not yet acquired a "secondary meaning" within the sense of that doctrine, we think that each part of the chain must be considered as a separate entity. See Quality Courts United, *397 Inc. v. Jones, 59 So.2d 20 (Fla. 1952). This being so, we fail to see how it can be said that petitioner operates within the territorial scope of respondent's stores. Recall that when the Chancellor entered his Final Order, respondent and petitioner operated stores jointly in only two counties, and in those counties, they were operating jointly only in Niceville, Okaloosa County. Recall further that in Niceville they operate in separate neighborhoods. How, then, can they be said to be in competition? "It is not the name which is protected, but the business." Federal Securities Co. v. Federal Securities Corp., 129 Or. 375, 276 P. 1100, 66 A.L.R. 934 (1929), cited with approval in Lumbermen's Mut. Cas. Co. v. Lumber Mut. Cas. Ins. Co. of New York, 154 Fla. 367, 17 So.2d 615 (1944); Tampa Wholesale Co. v. Foodtown, U.S.A., supra.
The Chancellor did not limit his findings merely to the fact that respondent had made a prior registration. He carefully considered the fact that there had been confusion "among persons doing business" with the litigants because of the similarity of their tradenames. The "customer confusion" test is associated with tradename protection under the general heading "unfair competition". In effect, this is merely a variation of the universal rule of tradename protection. The test is satisfied when it is shown by one seeking injunctive relief that, because of a similarity of tradenames, potential customers of the first appropriator of a tradename actually do business with a second appropriator under the mistaken impression that they are doing business with the first appropriator. If the test were satisfied in the instant case, then we would find no error in the Chancellor's order because his undue reliance on Chapter 495 would be cured by the fact that unfair competition was afoot. Stagg Shop of Miami, Inc. v. Moss, supra.
However, we find that when the Chancellor noted the existence of "confusion", he was not referring to the kind of confusion that is recognized by the common law. The Chancellor was referring to the fact that certain invoices and merchandise had been misdirected from stores in one chain to stores in the other by deliverymen and salesmen who were confused by the similarity in names. Testimony indicated that mistakes of this nature had also occurred between the litigants and stores wholly outside of their respective chains. In similar cases decided by other jurisdictions, this kind of error has not been deemed of sufficient consequence to support an injunction. See Umpqua Broccoli Exch. v. Um-Qua Broccoli Growers, 117 Or. 678, 245 P. 324 (1926); Federal Securities Co. v. Federal Securities Corp., supra. It is presumed that mistakes such as these are due merely to inattention on the part of those charged with the servicing of the needs of businesses, and that in time the inattention will be rectified.
The proper view of the "customer confusion" test, as indicated by the definition set out previously, is that it is concerned, not with provisioners, but with those who seek to do business at the consumer level. Note, for example, how the test was applied in Stagg Shop of Miami, Inc. v. Moss, supra, wherein a particular customer was queried as to her reason for shopping in the defendant's store. Testimony by particular customers is not essential as proof of the test so long as some evidence is presented regarding diminution in trade caused by the appropriation of a similar name by another. In the instant case, no evidence of a diminution in respondent's trade was submitted before the Chancellor, and no customer testimony was proffered.
It is true that the litigants have stipulated that the similarity of their signs and tradenames would cause confusion "if used in the same location." However, we do not think that this stipulation forecloses petitioner from the right to operate under a form of its corporate name, especially since at the time it began operation, it was far removed from any area served by the respondent. It should be remembered that *398 it was the respondent, not the petitioner, that made moves which presented the potential for commercial conflict; for example, petitioner had been in business in Okaloosa County since its incorporation, and had been in Niceville for some time before respondent placed a store in that town and in that county.
This brings us to the answer to our second question: At what point in time are the limits to territorial protection to be determined? Obviously, the answer depends upon the facts of the case. We think that the following words of the Chancellor given in a similar case, National Grocery Co. v. National Stores Corp., supra, are most appropriate:
"While I know of no decision of our own courts in a case on all fours with the present case, there are, however, many opinions in other jurisdictions that make it clear that the right of a given name previously adopted by a business located in one locality does not invest the proprietor of that business with the right to enjoin the use of the same or a similar name by a junior enterprise in another locality where one does not encroach upon the other. [Citations omitted.] But the complainant says that this rule is not applicable to the instant case, because, in the very nature of things, the prospect of a so-called chain store business is the constant expanding, reaching out, and establishing of new stores in neighborhoods not already tapped. Surely, in the great majority of business enterprises, and especially those like the complainant's, involving a business capable of expansion and the investment of large capital, there is implied the hope, intention, and design of constantly invading new territory for the purpose of securing an increasing volume of business. For reasons already touched upon, it would be absurd to say that any such intention should permit the pre-empting of the use of the name at a place and a time where such a supposed business enterprise had no customers or business, and therefore nothing to lose. It is entirely too remote and fanciful for the complainant to object to another using a name in another locality, not because he has already established his trade there, but because he may do so in the future. For it is equally probable he may not."
This question is important because, as the Chancellor observed in another strikingly similar case, Eastern Outfitting Co. v. Manheim, 59 Wash. 428, 110 P. 23, 35 L.R.A., N.S., 251 (1910), a case cited with approval by this Court, McGhan v. McGhan, 115 Fla. 414, 155 So. 653, the interest sought to be protected must exist in fact and not merely in fancy. To hold otherwise would be to invite needless litigation and to contribute substantially towards promoting a pointless disruption of commerce. The Chancellor should determine the effective scope of a complainant's business by including in his considerations the actual state of affairs as they existed at the time when the complaint was perfected. In the instant case, no evidence was presented to the Chancellor by respondent concerning any further planned expansion into the areas served by petitioner's stores, and, as we have already mentioned, there is insufficient evidence to support the contention that unfair competition existed at the time when the complaint was filed. This being so, we must conclude that the Chancellor erred when he issued his order since the evidence could not support it.
However, we do think that the facts of this case call for an injunction against petitioner for another reason. Even though one may have a right to use a tradename which happens to be similar to that of another, this right does not authorize one to use the tradename in a manner which tends to be deceptive. Gottdiener v. Joe's Restaurant, 111 Fla. 741, 149 So. 646 (1933); McGhan v. McGhan, supra; May v. May, 45 So.2d 494 (Fla. 1950).
*399 In the instant case, petitioner and respondent both operated under the "Jitney Junior" banner and liked the tradename because it was a fairly accurate description of their businesses. When petitioner's franchise expired, it chose to adopt the "Junior" label as part of its tradename; it should be recalled that petitioner's corporate name was Junior Food Stores of West Florida, Inc. In view of the facts, we have no complaint with petitioner's decision to adopt the tradename it chose. But we do think that it was unreasonable for petitioner to adopt the sign design it registered with the Secretary of State for the simple reason that it tends to be deceptive. Petitioner's signs are basically identical in nature to respondent's, with the exception that petitioner's signs include in very small lettering the words "Of West Florida, Inc." It is said that these words are so small that they are not readily visible from the road and that all a passerby tends to see is the large abbreviation "Jr." and the picture of a boy and the words "Food Store". We think that equitable principles require that, while petitioner is entitled to use the trade name it registered, it is not entitled to advertise itself in a manner which invites deception. For examples of other cases in which this Court has been concerned with the size of lettering in signs and advertising, see Richard Store Co. v. Richard's Warehouse Sales & Auction Gallery, Inc., 63 So.2d 502 (Fla. 1953); McGhan v. McGhan, supra; Gottdiener v. Joe's Restaurant, supra.
It is our opinion that the decision of the District Court should be quashed and the cause remanded to the Chancellor for further evidentiary hearing to determine the nature of an injunction to be rendered against petitioner in the light of our opinion and judgment, which injunction inter alia might, by its terms, require petitioner to increase the size of the words "Of West Florida, Inc." to dimensions which would cleanse its signs and advertising of any taint of deception or provide such other injunctive provisions as the equities of the case may require.
It is so ordered.
ERVIN, C.J., and ROBERTS, DREW and ADKINS, JJ., concur.