**FIRST BORN CHURCH OF THE LIVING GOD, et al., v. THE FIRST BORN CHURCH OF THE LIVING GOD.**

22 So. (2nd) 452                                                  June Term, 1945
June 12, 1945                                                       Division B

*O. C. Parker, Jr.,* appellants.

*J. Lewis Hall,* and *E. O. Blalock* (Waycross, Ga.) for appellee.

THOMAS, J.:

Although adherents of the appellant-church are parties litigant it will not be necessary to refer to those individuals, but only to the organizations themselves, in the singular, as

we comment upon the issues; and to minimize confusion because of the similarity of names we shall italicize in each instance the article "the" when alluding to the appellee.

*The* First Born Church of the Living God became a corporation in the State of Georgia by decree of the Superior Court of Ware County 14 May 1913, and 21 March 1939 was authorized by the Secretary of State of Florida to carry on here the objects for which it was incorporated. The present bishop, while testifying in this case, described its form of government as episcopal which he defined as a system whereby all member-churches are responsible to a parent organization. Of these member-churches constituting *The* First Born Church of the Living God forty are situated in Florida, including the ones at Apalachicola and Panama City involved in this controversy. Since their establishment both churches have participated in the meetings of the general church, paid to it assessments made against them, and followed the ritual prescribed by it.

On the roster of ministers of the church there has appeared from time to time the name of J. Q. Croom whose career has been somewhat mottled and loyalty somewhat inconstant. In 1913 he was one of the organizers of *The* First Born Church of the Living God and became its first bishop. Seven years later he severed his connection with the institution when, to use his words, "confusion came up." Ten years passed, when Croom regained his status as a pastor of the church and was sent to Apalachicola to take charge of the congregation there. In 1939 Croom again aspired to a bishopric, opposing the person who then held and now holds that position. Frustrated in his quest, Croom became vindictive and launched a campaign to foment dissension in the ranks of *The* First Born Church of the Living God. He instituted a suit for injunction and an action in mandamus in Georgia which terminated unfavorably for him. There is no need to give the details of this litigation or to particularize the efforts Croom, the disturber, made orally and by circulars to effect disunion in the church, but we will dismiss this phase of his activities by remarking that he was able eventually to create a schism. The circumstances relevant to the

instant controversy sprang from this disaffection. Before remarking further upon them it is well to give the status of the church property up to the time Croom became so disgruntled.

In 1918 a certain lot had been deeded to members of the church as trustees for the use and benefit of *The Church of the First Born of the Living God,* and ten years later the same grantors conveyed to the same trustees an adjacent lot to be held by them for the use and benefit of *First Born Church of the Living God.* Meanwhile in 1921 there had been "remised, released, and quitclaimed" to *The First Born Church of the Living God* a building to be removed to the premises and used as a meeting house. So much for the property at Apalachicola.

In 1921 two lots in Panama City, Florida, were deeded to certain named persons as trustees of *First Born Church of the Living God.*

Now, returning to Croom, erstwhile minister and bishop; after he had been rebuffed in his campaign for the office of bishop and had met defeat in his litigation in Georgia he and his cohorts formed a new corporation and were granted a charter by the circuit judge of Leon County under the title, First Born Church of the Living God, which, it will be noted, is the same name as that of the church with which he had been intermittently associated for many years save for omission of the article "the." It is noteworthy that in the articles of incorporation in the section providing for the officers who should manage the affairs of the corporation until succesors should be elected and qualified appeared the name of Croom as "bishop." This insurgent group took possession of the church property, locked the buildings when not actually used by them, and thwarted the performance of duties of pastors sent to the church by the bishop of *The* First Born Church of the Living God. Two days after letters of incorporation were issued, the trustees of the church property in Apalachicola executed a deed conveying the property to First Born Church of the Living God, and the month following the issuance of letters of incorporation trustees of the church property in Panama City also executed a deed

conveying that trust property to First Born Church of the Living God.

We find then, as a result of the machinations of J. Q. Croom, that title to property which had been used for a long time by *The* First Born Church of the Living God, a corporation in existence in Georgia for more than thirty years and in Florida for more than five years, was attempted to be vested in a corporation created as late as 1944 with a name so similar as to be almost indistinguishable and obviously brought into being to serve the ends of Croom. Incidentally, he admitted on the witness stand that he could not have entered the lists for the bishopric if his church had not at the time been a member of the appellee organization and bound by its rules and regulations; yet upon his defeat he brought about dissension among the membership and precipitated the issue whether the congregations, especially the one at Apalachicola of which he was pastor by the authority of the very church whose existence in that community he would destroy, should secede and become affiliated with appellant.

We are quite aware of the discrepancies in the names of the churches appearing in the several instruments we have described and of the fact that in two of them the name is precisely that of the appellant corporation; however, when it is remembered that the property has been used by the appellee corporation for church purposes for many years and especially when we recall Croom's connection with that organization we can only conclude that these differences are insignificant.

It seems to us that to state the set of facts is at once to condemn the conduct of Croom and the appellant corporation and approve the decree of the circuit judge (the same judge who granted the last letters of incorporation) setting aside the conveyances of the property and vouchsafing to the original body the exclusive use of the church property and the name, "*The* First Born Church of the Living God."

It will be apparent to anyone from reading this opinion that utter confusion resulted from the issuance of the last articles of incorporation. We drew attention to this at the

outset, and it may be well to observe now that even Croom, the instigator of the second organization, himself became confused, for in his pleadings and in his circulars he referred to both names indiscriminately. It is plain from the statements in his pleadings and in these circulars that he was completely befogged by the close resemblance of the titles.

The remedy of injunction is quite appropriate to prevent the use of a corporate name so similar to that of an existing corporation that deception, unfair competition, or confusion may result. The Grand Temple and Tabernacle in the State of Texas of Knights and Daughters of Taber of the International Order of Twelve v. Independent Order of Knights and Daughters of Tabor of America, 44 S. W. 2nd 973. This rule applies as well to a corporation of the kind we have described as to one formed to engage in trade. or industry. Benevolent and Protective Order of Elks v. Improved Benevolent and Protective Order of Elks of the World, 205 N. Y. 459, 98 N.E. 756. See also International Committee Y.W.C.A. v. Y.W.C.A. of Chicago, 194 Ill. 194, 62 N.E. 551. Confusion was calculated to arise from the incorporation in Florida of a body known as First Born Church of the Living God when there was already one in operation titled *The* First Born Church of the Living God; in fact, it is clear from this record that it has already arisen.

Having the view that the chancellor's ruling was so plainly correct we shall not dwell on the various features of the injunctive order, purposed to prevent further activities by the upstart corporation which would perpetrate this confusion and cause unquestionable injury to the established church.

The next point, and the only other one which seems worthy of discussion, is the propriety of the deeds from the trustees of the old corporation conveying its properties in Apalachicola and Panama City to the new. Execution of these instruments was a palpable wrong. Whatever title vested previously in the grantees was held by them solely as trustees for the appellee corporation, and they were wholly without authority to transfer to the appellant in the circumstances we have detailed. Of course these trustees could have, if properly authorized, converted the assets in their

hands by conveying the realty to another, but this was not such an instance, nor is this what was attempted. It was an effort to transfer allegiance *and* capital to the abortive corporation in disregard of the rights of minorities. Even assuming the correctness of appellant's contention that majorities of the congregations preferred affiliation with it, they could not prevail by joining the new group and taking with them the physical properties of the old. In such case these minorities would be left without houses of worship, unless they too transferred their allegiance, against their will; else they would be forced to provide other accommodations.

It has been held that temporalities of one denomination may not be transferred to another denomination in such fashion, and we think the same principle would apply to the facts in this case, for although the creeds of the two bodies are probably similar, if not identical, nonetheless the new one is separate and hostile. Baptist City Mission Soc. of Denver v. People's Tabernacle Congregational Church of Denver, 64 Colo. 574, 174 Pac. 1118. See Park, et al., v. Chaplin, et al., 96 Iowa 55, 64 N. W. 674; Mitchell, et al., v. Church of Christ at Mt. Olive, 221 Ala. 315, 128 So. 781.

It has been sought to inject the argument here that such action should be sanctioned because it was meant by the original grantors that the properties should be available to the local residents as distinguished from persons living in the adjoining State of Georgia. The efficacy of such contention it is impossible for us to comprehend. The use of the property will be available to all who subscribe to the tenets and doctrines of appellee. The church buildings will not be moved. Whether they remain under the dominion of *The* First Born Church of the Living God, incorporated in Georgia and empowered to function in Florida, or come under the dominion of First Born Church of the Living God, chartered in Florida, would not affect the use of the properties by persons in Apalachicola or Panama City one jot or tittle.

Affirmed.

CHAPMAN, C. J., BROWN and SEBRING, JJ., concur.