THE CHRISTIAN SCIENCE BOARD OF DIRECTORS OF THE FIRST CHURCH OF CHRIST, SCIENTIST, IN BOSTON, MASSACHUSETTS, AND THE BOARD OF TRUSTEES OF THE CHRISTIAN SCIENCE PUBLISHING SOCIETY, PLAINTIFFS-APPELLANTS, v. DORIS W. EVANS, STEPHEN T. EVANS, ROY DOBBELAAR, JOANNE JANNUZZI, RUTH PFEIFER AND MARY BETH SINGLETERRY, AS MEMBERS OF THE BOARD OF TRUSTEES OF THE FIRST CHURCH OF CHRIST, SCIENTIST, PLAINFIELD, NEW JERSEY, AND THE FIRST CHURCH OF CHRIST, SCIENTIST, PLAINFIELD, NEW JERSEY, ALSO KNOWN AS THE INDEPENDENT CHRISTIAN SCIENCE CHURCH, PLAINFIELD, NEW JERSEY, DEFENDANTS-RESPONDENTS.

Argued March 18, 1986—Decided February 23, 1987.

*Arthur J. Greenbaum,* a member of the New York bar, argued the cause for appellants (*McCarter & English,* attorneys; *Arthur J. Greenbaum* and *John L. McGoldrick,* of counsel; *John L. McGoldrick* and *Roslyn S. Harrison,* on the briefs).

*James J. Shrager* argued the cause for respondents (*Hannoch Weisman,* attorneys; *Miriam E. Cahn,* on the brief).

The opinion of the Court was delivered by

CLIFFORD, J.

Plaintiffs seek to enjoin defendants from using the phrase "Christian Science" as any part of the name of a church not affiliated with plaintiffs. The trial court granted injunctive relief, but the Appellate Division reversed, one judge dissenting, 199 *N.J.Super.* 160. Plaintiffs' appeal is therefore here as of right. *R.* 2:2–1(a)(2). We affirm.

I

Christian Science is a religion founded by Mary Baker Eddy in 1866. As the religion grew, there developed an organizational structure. In 1879 The Church of Christ, Scientist, was founded in Lynn, Massachusetts. From 1881 until 1889 Mrs. Eddy was principal of the Massachusetts Metaphysical College, which was replaced by the First Church of Christ, Scientist (the "Mother Church"), established in 1889 and relocated in Boston, Massachusetts in 1892. 2 J. Melton, *The Encyclopedia of American Religions* 74–77 (1978). Plaintiff Board of Directors is a Massachusetts corporation that conducts the business of the Mother Church. The Church has a separate publishing arm, governed by the plaintiff Board of Trustees.

The Mother Church, which is the center of a world-wide religious organization, bears the formal name "The First Church of Christ, Scientist." Local members of the organization consist of branch churches or societies, the difference between the two being primarily a matter of size. Branch churches are formally designated "First Church of Christ, Scientist," followed by a geographical designation, unless they are the second or third branch within one city, in which case the numerical designation changes. These names are prescribed by the Church Manual, and are provided for in New Jersey by

statute, *N.J.S.A.* 16:3–2. Typically, the branch churches establish "Christian Science Reading Rooms," where publications relating to the religion are made available to the public.

The individually-named defendants are trustees of the defendant church (the "Plainfield Church"), which was formerly a branch church affiliated with plaintiffs. The Plainfield Church became an authorized branch of the Mother Church in 1892, the year the Mother Church was first located in Boston. In 1977 a doctrinal schism developed between the Boston organization and the Plainfield Church. On June 16, 1977, plaintiff Board of Directors gave notice that it was withdrawing its recognition of the Plainfield Church as a branch of the Mother Church. The letter of notice also declared, "Former First Church, Plainfield, no longer has the legal right to identify itself publicly as a 'Church of Christ, Scientist' or a 'Christian Science Church' or in any other way use the term 'Christian Science' or similar words to describe any of its activities."

After receipt of this notice, defendants began taking steps to disassociate the Plainfield Church from the Mother Church. The Plainfield Church terminated its status as a corporation formed under *N.J.S.A.* 16:3–1 to –11 (which refer consistently to "church of Christ, Scientist," and nowhere use the expression "Christian Science church"), and reincorporated as a general religious corporation under *N.J.S.A.* 16:1–1 to –12. It adopted the name "Independent Christian Science Church of Plainfield, New Jersey."

Plaintiffs filed this suit on July 21, 1980. Their cause of action rested on asserted trade mark and service mark rights in the phrases "Church of Christ, Scientist" and "Christian Science." They sought to enjoin defendants

from using as the name of, or in connection with, any church, religious group, society, association, organization, or service now existing or which may be organized or exist, independently of the Mother Church and its branches, the names or designations, "Church of Christ, Scientist," "First Church of Christ, Scientist," "Branch Church of Christ, Scientist," "Christian Science Church," "Independent Christian Science Church," "Christian Science Reading Room,"

"Independent Christian Science Reading Room," or any name so similar thereto as to be likely to deceive the public or lead to confusion.

Plaintiffs alleged that the terms used by defendants so nearly resembled plaintiffs' names and marks (trademarks and service marks) as to be likely to cause confusion, mistake, and deception, to constitute false representation, and to result in unfair appropriation of plaintiffs' name, reputation, and good will. They charged that use of the terms constituted a false designation of origin and a false description or misrepresentation under federal trademark law, section 43 of the Lanham Act, 15 *U.S.C.A.* § 1125.

Plaintiffs alleged further that defendants' use of the terms infringed on plaintiffs' registered trade and service marks (marks for publications, *e.g.,* "Christian Science Monitor"), violated *N.J.S.A.* 56:4–1 ("No merchant, firm or corporation shall appropriate for his own use a name, brand, trade-mark, reputation or goodwill of any maker in whose product such merchant, firm or corporation deals."), and constituted "unfair competition, trademark and service-mark infringement, palming off, dilution and injury to reputation, all in violation of the common law of the State of New Jersey."

The trial court granted injunctive relief. *Christian Science Bd. of Directors v. Evans,* 191 *N.J.Super.* 411 (Ch.Div.1983). The court assumed, without deciding, the threshold issue, namely, that plaintiffs had a protectible trademark interest in "Church of Christ, Scientist" and "Christian Science" when used in or as part of the name of a church, *id.* at 422, and then pursued a "likelihood of confusion" analysis—that is, it concluded that plaintiffs had shown likelihood of confusion and potential damage by defendants' continued use of the terms, sufficient to justify an injunction *Id.* at 422–23. The trial court's faulty premise, endorsed by the dissent as a finding of fact, *post* at 316, 321 (we see it rather as a holding of law, and an incorrect one at that) led it to enter judgment enjoining defendants from using for any of its organizations any name or designation that includes any of the following phrases: Church

of Christ, Scientist; Christ, Scientist; Christian Science Church; Christian Science. It also enjoined defendants from making a representation likely to lead the public to believe they were affiliated with the plaintiffs, "provided that this * * * shall not prohibit Defendants from using, in a fair, truthful, and non-deceptive manner, both as to form and content, the term 'Christian Science' in phrases or sentences to refer to the religion developed by Mary Baker Eddy."

Defendants appealed, and pending appeal proposed to use the name

## PLAINFIELD COMMUNITY CHURCH

### AN INDEPENDENT CHURCH PRACTICING CHRISTIAN SCIENCE.

Because plaintiffs viewed defendants' use of that name as violative of the trial court's judgment, they sought an Order in Aid of Litigants' Rights enjoining use of the proposed name. The trial court agreed that the proposed use of the term "Christian Science" as part of the name of the church amounted to a trademark use in violation of the judgment. It therefore ordered that the second line, "An Independent Church Practicing Christian Science," be used, if at all, only as an explanatory phrase rather than as part of the name. The order included specific restrictions on the size, type, and style of lettering.

On appeal to the Appellate Division defendants challenged only the restraints on their use of "Christian Science" and "Christian Science Church." Therefore the injunction stands against their use of "Christ, Scientist" and "Church of Christ, Scientist."

A divided Appellate Division held that plaintiffs were not entitled to exclusive use of the phrase "Christian Science" when used as part of the name of a church. *Christian Science Bd. of Directors v. Evans*, 199 *N.J.Super.* 160 (1985). The court rested that holding on its conclusion that the primary signifi-

cance to the public of the phrase "Christian Science" is as the name of a religion, hence the phrase could not be protected as a trade name for the name of a church. *Id.* at 168. The court further held that "Christian Science" was protectible when used as part of the trade name "Christian Science Reading Room." *Id.* at 171–72. The Appellate Division therefore restrained defendants from using any variation of "Christ, Scientist," or "Christian Science" in connection with a Reading Room. One judge dissented from so much of the majority opinion and judgment as reversed the trial court's injunction against defendants' use of "Christian Science" in the name of their church, *id.* at 172, thereby framing the sole issue presented on this appeal. The injunction regarding Reading Rooms continues without challenge.

## II

■ The parties and the courts below approached this case almost exclusively in terms of the law of unfair competition, of which the subjects of trademarks, service marks, and trade-names are branches. See 1 J.T. McCarthy, *Trademarks and Unfair Competition* § 2.2 at 51 (2d ed. 1984) (hereinafter McCarthy). In the context of this case those various areas of law overlap but do not differ significantly. For convenience we treat them throughout this opinion as interchangeable. Typically, the principles involved surface in commercial settings, and the language used is often peculiarly suited to those settings. For that reason their fit is awkward when they are applied to religious or eleemosynary institutions. Notwithstanding, those institutions are entitled, no less than are commercial enterprises, to the protection of the law of unfair competition. *See generally National Bd. of Young Women's Christian Ass'n v. Young Women's Christian Ass'n,* 335 *F.Supp.* 615, 621 (D.S.C.1971) ("a religious, benevolent or fraternal organization is entitled to protect the use of its name against those who secede"); *National Spiritual Assembly of The Baha'is Under the Hereditary Guardianship, Inc. v.*

*National Spiritual Assembly of The Baha'is,* 150 *U.S.P.Q.* 346, 354–55 (N.D.Ill.1966) (church organizations can develop protectible goodwill in marks, and are entitled to protection from injury to reputation and from loss of potential members through use of confusingly similar marks by competitors); Annotation, *Right of Charitable or Religious Association or Corporation to Protection Against Use of Same or Similar Name by Another,* 37 *A.L.R.*3d 277 (1971) (collecting cases on the topic). Thus plaintiffs are entitled to have their claim of exclusive right to the name "Christian Science Church" evaluated under principles of law more commonly applied to commercial entities.

### III

As we have pointed out, the religion of Christian Science was founded at least thirteen, and possibly twenty-three, years before establishment of the Mother Church, the organization now centered in Boston. Although the Boston organization has now co-existed with the Christian Science religion for close to a century, an understanding of this case requires recognition of two significant, related facts: first, the religion and the organization are conceptually separate; and second, the religion pre-existed the organization.

The point of our departure from our dissenting colleagues may be found in the consequences we attach to those important elements, consequences that the law has come to recognize: (1) because "Christian Science" is the name of a religion, anyone practicing a religion other than the Christian Science religion could be prohibited from using "Christian Science" in the name of a church—and, obversely, anyone practicing "Christian Science" can use that phrase in the name of a church; (2) because defendants practice the Christian Science religion (as plaintiffs readily acknowledge), they are entitled to use "Christian Science" in the name of their church.

If in the late nineteenth century, in the early, formative stages of both the religion and the Mother Church, the founders of the Plainfield Church had chosen to practice the religion of Christian Science by following the religious teachings of Mary Baker Eddy, but had decided that their church should not become a member of the Mother Church organization, it is certain that there could have been no restraint on their use of the name "Christian Science Church." In fact, not even Mrs. Eddy, founder of the religion and of the Mother Church, would have been empowered by law to prevent defendants' use of the name "Christian Science Church," provided that name were truthful (in the sense that it accurately referred to the religion practiced by defendants). In *Primal Feeling Center, Inc. v. Janov*, 201 *U.S.P.Q.* 44 (TTAB[1] 1978), there was a successful challenge to federal registration by Dr. Janov of the service mark "Primal Therapy"—this, even though Janov had developed the method of therapy, coined the expression "primal therapy," and used that name exclusively for some time. The court found it was impossible to talk about his technique without using "Primal Therapy" as the common term for it. *Id.* at 50. Because others provided the same therapeutic services, they had a right to use the common name in their businesses and to prevent its registration by Dr. Janov. *Id.* at 56.

The fact that defendants seek here to use the name "Christian Science Church" now, after plaintiffs have used the phrase with little competition for a long period, makes no difference. Plaintiffs simply cannot appropriate, from the public domain, the common name of a religion and somehow gain an exclusive right to its use and the right to prevent others from using it. This principle is fundamental to the law of trademarks, the body of law under which plaintiffs seek relief.

> Generic names are regarded by the law as free for all to use. They are in the public domain. * * * To grant an exclusive right to one firm of use of the generic name of a product would be equivalent to creating a monopoly in that

---

[1]Trademark Trial and Appeal Board.

particular product, something that the trademark laws were never intended to accomplish. [McCarthy, *supra,* § 12.1 at 521 (footnotes omitted).]

If such a result is scrupulously avoided in respect of sellers and products, surely the rights of "competing" proponents of a religion should be guarded even more zealously. (In fact, that right has been protected in numerous cases involving religion, discussed *infra,* Section VI.)

Plaintiffs demonstrated before the trial court that the Christian Science church organization centered in Boston is referred to, by itself and by the public, as the "Christian Science Church." It is natural that this usage would develop. It is equally natural and likely that new churches in which Christian Science is practiced will be called, regardless of their corporate names or formal designations, "Christian Science Churches." This is because, as a matter of pure common sense, "Christian Science Churches" is a generic name for churches in which Christian Science is practiced. Consider the reasoning of the Court of Customs and Patent Appeals in *In re Bailey Meter Co.,* 102 *F.*2d 843 (1939):

[T]he appellant concludes ["Boiler Meter"] does not name the device to which it is applied.

However, this argument ignores the fact that the product of appellant is a meter and that it is used in connection with boilers. It is, therefore, a boiler meter. Indeed, we are unable to see how the device could be more aptly described. Words used in combination may not be found in the dictionary, or elsewhere, in the precise combination used but it does not follow from this that they are not the correct nomenclature for particular things. As the brief of the solicitor points out "barn key" may not appear in the dictionary but it is the proper name for a key to a barn. Mere use of the words in combination does not destroy the significance of their meaning or their descriptive properties. [*Id.* at 844.]

The court denied trademark registration for "Boiler Meter." On the basis of the reasoning so persuasively employed by that court, we conclude that the term "Christian Science Church" is not entitled to trademark status.

The notion that the existing generic name of a thing cannot be appropriated as a trademark by one producer has historic support in case law.

[A]s its office is to point out distinctively the origin or ownership of the articles to which it is affixed, it follows that no sign or form of words can be appropriated as a valid trademark which, from the nature of the fact conveyed by its primary meaning, others may employ with equal truth and with equal right for the same purpose. [*Elgin Nat'l Watch Co. v. Illinois Watch Case Co.*, 179 *U.S.* 665, 673, 21 *S.Ct.* 270, 273, 45 *L.Ed.* 365, 378–79 (1901).]

In line with this approach is *Kellogg Company v. National Biscuit Company*, 305 *U.S.* 111, 59 *S.Ct.* 109, 83 *L.Ed.* 73 (1938), a landmark case that denied trademark protection for the name "Shredded Wheat." The Court held that "shredded wheat" was the generic term for the pillow-shaped cereal biscuits known to the public by that name.

The evidence shows only that due to the long period in which the plaintiff or its predecessor was the only manufacturer of the product, many people have come to associate the product, and as a consequence the name by which the product is generally known, with the plaintiff's factory at Niagara Falls. [*Id.* at 118, 59 *S.Ct.* at 113, 83 *L.Ed.* at 78.]

Exclusive production of a product may cause people to identify the product with a single source, but this will not entitle the producer exclusively to appropriate a mark that consists of nothing more than the name of the object. *Schulmerich Elecs. v. J.C. Deagan, Inc.*, 202 *F.*2d 772, 777 (C.C.P.A.1953). The Mother Church has been virtually the exclusive "producer" or "supplier" of the Christian Science religion. This is evidenced by the rarity of schisms in this relatively young religion and by the fact that separate sects have not survived. But the absence of other groups using the name of the religion in the names of their churches does not render the right to use of the name the exclusive property of plaintiffs. Exclusive use "cannot take the *common descriptive* [*i.e.*, generic] name of an article out of the public domain and give the temporarily exclusive user of it exclusive rights to it, no matter how much money or effort it pours into promoting the sale of the merchandise." *J. Kohnstam, Ltd. v. Louis Marx & Co., Inc.*, 280 *F.*2d 437, 440 (C.C.P.A.1960); *see* 3 R. Callman, *The Law of Unfair Competition Trademarks and Monopolies* § 18.03 at 7 (4th ed. 1983) (hereinafter Callman).

## IV

■ Plaintiffs would have us hold that "Christian Science Church" is not a generic name of a church in which is practiced the religion practiced both by plaintiffs and by defendants. (As noted, plaintiffs concede that defendants practice Christian Science.) They urge that "Christian Science Church" is merely a "descriptive" term. "Descriptive" is a term of art in trademark law. If the phrase that is the object of dispute here is the generic name for the churches of both parties, plaintiffs could never obtain trademark status for the phrase, and defendants have as much right as do plaintiffs to refer to their church as a Christian Science Church. If on the other hand the coveted phrase were held to be merely descriptive, and not a generic name, then trademark protection would be possible if plaintiffs could demonstrate a "secondary meaning" for the phrase. McCarthy, *supra*, § 11.9 at 454, § 12.5 at 539; *see Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 *F*.2d 75 (7th Cir.1977), *cert. denied*, 434 *U.S.* 1025, 98 *S.Ct.* 751, 54 *L.Ed.* 2d 772 (1978). To show secondary meaning a party must show that the descriptive mark is recognized by the public as denoting a single seller or source. *Aloe Creme Laboratories, Inc. v. Milsan, Inc.*, 423 *F*.2d 845, 849 (5th Cir.), *cert. denied*, 398 *U.S.* 928, 90 *S.Ct.* 1818, 26 *L.Ed.*2d 90, *reh'g denied*, 400 *U.S.* 856, 91 *S.Ct.* 23, 27 *L.Ed.*2d 95 (1970); McCarthy, *supra*, § 11.9 at 454.

■ A showing of "secondary meaning," no matter how strong, can never earn trademark status for a generic word or phrase. It is this fact that has led to the coining of the phrase "de facto secondary meaning." What is meant is that when a producer selects as a trademark a term that is deemed already to have been the commonly-recognized (generic) name of the goods, then even if that producer successfully establishes "de facto" secondary meaning, it will not be recognized *de jure*. *See A.J. Canfield Co. v. Honickman*, 808 *F*.2d 291, 297 (3rd Cir.1986); Greenbaum, Ginsburg and Weinberg, "A Proposal

for Evaluating Genericism After 'Anti-Monopoly'," 73 *Trademark Rep*. 101, 122–23 (1983).

[N]o matter what the market situation may have been as to indication of origin or secondary meaning, the common descriptive name of the product cannot become a trademark owned exclusively by one vendor.

\*    \*    \*    \*    \*    \*    \*    \*

[M]erchants act at their peril in attempting, by advertising, to convey common descriptive names, which belong to the public, to their own exclusive use. Even though they succeed in the creation of de facto secondary meaning, due to lack of competition or other happenstance, the law respecting registration will not give it any effect. [*Weiss Noodle Co. v. Golden Cracknel and Specialty Co.*, 290 *F*.2d 845, 847–48 (C.C.P.A.1961).]

Because we have concluded that "Christian Science Church" is generic and not descriptive, any secondary meaning shown by plaintiffs is of no avail to them.

## V

■    Plaintiffs argue, and the dissent accepts the proposition (*post* at 322), that their position is vindicated by The Trademark Clarification Act of 1984, P.L. 98–620, 98 Stat. 1335 (1984), which amended the Federal Trademark Act of 1946 (the Lanham Act), 15 *U.S.C.A.* §§ 1051–1127. The amendments addressed the problem of "dual-function" marks—marks that may serve to identify both a product and its source. We do not agree with plaintiffs that this case falls within the scope of those provisions of the federal trademark law. It is clear that the Lanham Act was amended in response to the Ninth Circuit decision in *Anti-Monopoly, Inc. v. General Mills Fun Group*, 611 *F*.2d 296, 305 (1979), after remand, 684 *F*.2d 1316 (1982), *cert. denied sub nom. CPG Products Corp. v. Anti-Monopoly, Inc.*, 459 *U.S.* 1227, 103 *S.Ct.* 1234, 75 *L.Ed.*2d 468, *reh'g denied*, 460 *U.S.* 1104, 103 *S.Ct.* 1805, 76 *L.Ed.*2d 369 (1983). *See S.Rep.* No. 627, 98th Cong. 2d Sess. 9 (1984), *reprinted in* 1984 U.S.Code Cong. & Ad. News 5708, 5718, 5726 (hereinafter Senate Report).

In *Anti-Monopoly* the court held that the registered trademark "Monopoly" had become the generic name for real estate

board games. In reaching that conclusion the court deviated from the previously well-recognized test that focused on the primary significance of the term to the consuming public, and adopted instead a "motivation" test, 684 *F.*2d at 1324–25, which looked essentially to the reasons the consumer bought the product. Based on that test and because "Monopoly" served to identify the product—a real-estate board game—the court held that "Monopoly" had lost its trademark status, *i.e.*, it had become generic.

The *Anti-Monopoly* decision created an uproar among commentators and practitioners. See Senate Report, *supra*, at 5722. Congress responded by amending the Lanham Act to make clear that trademarks and service marks may distinguish unique products and products whose source is unknown, 15 *U.S.C.A.* § 1127. The legislation also provided that registered marks will not be deemed to have become common descriptive (generic) names of goods or services solely because they are also used to identify a unique product or service. 15 *U.S.C.A.* § 1064(c). Congress rejected the Ninth Circuit approach out of hand and restored the "primary significance" text. Significantly, Congress emphasized that the amending legislation was designed to clarify the test for determining whether a registered mark has become the common descriptive name of an article or service—that is, has become generic. *Id.* at 5724, 5726.

The amendments were not intended to change existing trademark law. Among the many doctrines left securely in place was the basic principle that no producer may usurp a generic term. *Id.* at 5725. The legislation recognized that there are two types of generic words or terms: those that are inherently generic, and those that originated as trademarks but through usage suffered the loss of their distinctive sense, characteristic, or meaning. See, *e.g,, Henry Heide, Inc. v. George Ziegler Co.*, 354 *F.*2d 574 (7th Cir.1965); Zivin, "Understanding Generic Words," 63 *Trademark Rep.* 173, 176 (1973). The Lanham Act amendments dealt only with the latter.

We appreciate full well that a name of a product can of course be a source-identifier. It is especially important to recognize that fact in cases in which a manufacturer of a unique product first encounters competition, possibly by patent expiration, as happened in *Anti-Monopoly, supra*, 611 *F.*2d 296. However, those concerns have no bearing on the case before us. Plaintiffs are not facing cancellation of a registered mark. Nor are they sole suppliers of a "unique product," facing competition for the first time due to expiration of a patent or to some comparable circumstance. Our denial of plaintiffs' request for trademark protection and injunctive relief does not stem from any lack of appreciation of the significance of "dual-function" marks. The Lanham Act amendments simply do not bear on the problem posed in this case.

## VI

We have adverted to our discomfiture in addressing this religious dispute in terms more appropriate to the commercial world. See *supra* at 304. We have also stated our view, *supra* at 306–307, that the policies against allowing monopolization of generic names, which lead to monopolization of supply, should be applied at least as strictly to religious as to commercial products. Our society is filled with diverse religions and with diverse denominations within or stemming from those religions. Many separate groups that now share some common element in their names were once single denominations. "Nearly all our varieties of churches of the same denomination are the results of secession or withdrawals from the parent church of that name, and it has been the usual course for the new church to adopt as a permanent part of its name the name of the parent organization." *Supreme Lodge Knights of Pythias v. Improved Order Knights of Pythias*, 113 *Mich.* 133, 136, 71 *N.W.* 470, 471 (1897). Those concerns support the result we reach today. Moreover, disputes similar to the one before us have been addressed by numerous other courts. We draw our support from their decisions. Our review

of those cases strengthens our conviction that it would be wholly inappropriate to grant the relief plaintiffs seek here.

The most strikingly similar example is found in *McDaniel v. Mirza Ahmad Sohrab*, 27 *N.Y.S.*2d 525 (Sup.Ct.), aff'd, 262 *A.D.* 838, 29 *N.Y.S.*2d 509 (1941). Plaintiffs were members of the National Spiritual Assembly and Trustees of the Baha'is of the United States and Canada. "Baha'i" is the name of a worldwide religion. Plaintiffs represented the official church organization. Defendants, former members of an authorized Baha'i congregation, were conducting Baha'i religious activities without the authority of plaintiffs. Plaintiffs' complaint seeking a prohibition against defendants' engaging in those activities was dismissed as "insufficient in law." The court said:

> The plaintiffs have no right to a monopoly of the name of a religion. The defendants, who purport to be members of the same religion, have an equal right to use the name of the religion in connection with their own meetings, lectures, classes and other activities. * * * Defendants have the absolute right to practice Baha'ism, to conduct meetings, collect funds and sell literature in connection therewith, and to conduct a book shop under the title "Bahai Book Shop." [27 *N.Y.S.*2d at 527.]

The similarity between the Baha'i case and the one before the Court supports a similar result here. The official Baha'i organization includes the National Spiritual Assembly of the Baha'is and local Spiritual Assemblies. While an injunction against the use of those exact names might be justified (and was granted in an unrelated case, *National Spiritual Assembly of the Baha'is, supra,* 150 *U.S.P.Q.* 346), the name of the religion itself was held available for all. The Plainfield Church apparently acknowledges that plaintiffs may rightfully claim exclusive use of the names "Church of Christ, Scientist," and "First Church of Christ, Scientist." We find the parallel to the Baha'i cases to be almost exact, and we hold, as did the New York court, that "plaintiffs have no right to a monopoly of the name of a religion." *McDaniel v. Mirza Ahmad Sohrab, supra,* 27 *N.Y.S.*2d at 527.

The same approach was taken in *New Thought Church v. Chapin,* 159 *A.D.* 723, 144 *N.Y.S.* 1026 (1913). The court

refused to enjoin the defendant from conducting services under the name "New Thought Services," and it denied plaintiff the exclusive right to use the name of the religion—"New Thought."

The plaintiff apparently has founded a new system of religion based on a new creed. The name it has chosen indicates: First, the system of religion which it teaches; and, second, that it teaches that system through the medium of organizations known as churches. It surely is not in a position to successfully claim a monopoly of teaching this form of religious faith by means of organizations known by the generic names of churches. [*Id.* at 724, 144 *N.Y.S.* at 1028.]

A preliminary injunction was denied in *Board of Provincial Elders of the Moravian Church v. Jones*, 273 N.C. 174, 159 *S.E.*2d 545 (1968). Plaintiff was the governing body for regulation of Moravian churches in its province. Forty-seven churches were within its jurisdiction. The defendant, "The Bible Moravian Church," was established without plaintiff's knowledge or consent, and was the only Moravian church not affiliated with plaintiff. Its pastor was formerly affiliated with plaintiff. Evidence indicated that the term "Moravian," descriptive of the people of a part of Czechoslovakia, was precious to the plaintiffs because they associated it with their religious heritage. Defendants claimed the same religious heritage and same attachment to the word. In reversing an order granting a preliminary injunction, the court observed, "[s]urely, some combination of words, including 'Moravian,' could be found which would convey no impression of affiliation with the plaintiff." *Id.* at 185, 159 *S.E.*2d at 553.

Similar disputes arose between two groups who followed a religious philosophy entitled "Rosicrucian." Dissension arose and one group became two, then one again, then two. The court, called on to adjudicate rights in property and rights in the name "Rosicrucian," affirmed a denial of injunction against use of the name "Rosicrucian Fellowship." *Rosicrucian Fellowship v. Rosicrucian Fellowship Non-Sectarian Church*, 39 *Cal.*2d 121, 245 *P.*2d 481 (1952), *cert. denied*, 345 *U.S.* 938, 73 *S.Ct.* 828, 97 *L.Ed.* 1365 (1953).

Defendants have selected a new name for their church: "Independent Christian Science Church of Plainfield, New Jersey." It is different from the formal name formerly used by it as a branch of the Mother Church and still used by all branches of the Mother Church. We therefore consider inapposite those cases in which dissident church groups were enjoined from using identical or near-identical names as those they held when formerly affiliated with their adversaries. See, *e.g., Purcell v. Summers,* 145 *F.*2d 979 (4th Cir.1944) (non-merging members not entitled to continue using name "Methodist Episcopal Church, South"); *National Spiritual Assembly of the Baha'is, supra,* 150 *U.S.P.Q.* 346; *Carnes v. Smith,* 236 *Ga.* 30, 222 *S.E.*2d 322, *cert. denied,* 429 *U.S.* 868, 97 *S.Ct.* 180, 50 *L.Ed.*2d 148 (1976) (dissident Methodist parish withdrew from parent organization, court held dissident group could not continue to use the name "Noah's Ark Methodist Church;" adding a parenthetical "(Independent)" was not enough to protect the parent's interest in the value of the name); *Lutheran Free Church v. Lutheran Free Church (Not Merged),* 273 *Minn.* 332, 141 *N.W.* 2d 827 (1966) (defendants' use of the name "Lutheran Free Church (Not Merged)" enjoined because of the likelihood of confusion with plaintiff); *First Born Church of the Living God v. The First Born Church of the Living God,* 156 *Fla.* 78, 22 *So.*2d 452 (1945) ("First Born Church * * * " seceded from *"The* First Born Church * * *." The court held that the original church was entitled to exclusive use of the church property and name, noting that confusion had been intended and had resulted); *Methodist Episcopal Church South, Inc. v. Decell,* 60 *Ga.App.* 843, 5 *S.E.*2d 66 (1939) (Methodist Episcopal Church South was entitled to exclusive use of that name).

The trial court here relied extensively on *Jandron v. Zuendel,* 139 *F.Supp.* 887 (N.D.Ohio 1955). Plaintiffs, directors and trustees of The First Church of Christ, Scientist (The Mother Church), sought to enjoin defendants, members of the Third Church of Christ, Scientist, in Akron Ohio, from using the name "Third Church of Christ, Scientist" or any construction or name

so similar to "Church of Christ, Scientist" or "Christian Science Church" as to be likely to deceive or confuse the public. *Id.* at 888. The court granted the injunction, finding that use of the names would permit defendants to appropriate the goodwill and identity of the Mother Church. *Id.* at 889. The court found the decision in *Purcell v. Summers, supra,* 145 *F.*2d 979, dispositive. In *Purcell v. Summers* the court enjoined use of the name "Methodist Episcopal Church, South," but specifically noted that the terms Methodist and Episcopal were generic and *could* be used in a new name so different as to avoid confusion. We agree with the Appellate Division, 199 *N.J.Super.* at 170, that *Purcell v. Summers* does not support the result reached in *Jandron v. Zuendel.* We therefore do not adopt the *Jandron* approach.

## VII

The courts below did not address concerns raised by defendants in respect of constitutional implications of the trial court's injunction. Having affirmed the dissolution of the injunction, we need not decide those issues. We agree with the courts below that if the injunction were upheld because plaintiffs had a valid trademark interest, then no free speech rights of defendants would be infringed. As to the question of whether an injunction would violate defendants' rights to exercise their religion freely or would violate federal or state constitutional prohibitions against the establishment of religion, *U.S. Const.* amend. I; *N.J. Const.* of 1947 art. I, ¶ 4, we go no further than to record our grave reservations.

The judgment of the Appellate Division is affirmed.

GARIBALDI, J., dissenting.

I dissent from the majority's conclusion that the name "Christian Science Church" is entitled to no protection under trademark law. I find that there is adequate, substantial, and credible evidence to support the trial court's finding that "Christian Science Church" is a protectible trademark because

it is a descriptive term that signifies a church's affiliation with the Mother Church.[1] I would enjoin defendants from using the name "Independent Christian Science Church of Plainfield, New Jersey" because it creates a likelihood that the public will confuse defendants' church with plaintiffs' church. I would, however, allow defendants to use the name "Plainfield Community Church—An Independent Church Practicing Christian Science" because this name sufficiently differentiates defendants' church from the Mother Church.[2]

The finding that "Christian Science Church" is a protected trademark term does not, as the majority. suggests, allow plaintiffs to "appropriate, from the public domain, the common descriptive name of a religion and somehow gain an exclusive right to its use." *See Ante* at 306. Plaintiffs concede that "Christian Science," used *as the name of a religion,* is generic and "can be used by anyone in that sense." Anyone can use the term "Christian Science" to refer to his or her religion. But not everyone should be permitted to use "Christian Science Church" to name his or her church.

## I

Although this case concerns religious organizations, it is a trademark case. It has long been recognized that principles of

---

[1]The trial court explicitly rejected defendants' argument that "Christian Science Church" is a generic term. *See* 191 *N.J.Super.* 411, 425 (Ch.Div.1983). The majority is therefore incorrect when it asserts that the court simply assumed that "Christian Science Church" is a protectible trademark. *See Ante* at 302.

[2]The trial court enjoined defendants' use of any name or designation that includes any of the following terms or phrases: "Church of Christ, Scientist"; "Christ Scientist"; "Christian Science Church"; and "Christian Science." Defendants do not appeal the restraint on the terms "Church of Christ, Scientist" or "Christ Scientist." 199 *N.J.Super.* 160, 164 (App.Div.1985). I would hold that the use of the word "Christian Science Church" is a protectible trademark. Whether the use of the term "Christian Science" in a particular church name is prohibited depends upon whether that particular name is likely to mislead the public into believing the church is affiliated with the Mother Church.

trademark law applicable to commercial enterprises are equally applicable to cases involving churches and other religious and charitable organizations. *See Purcell v. Summers,* 145 *F.*2d 979, 985 (4th Cir.1944); *National Board of Young Women's Christian Ass'n v. Young Women's Christian Ass'n,* 335 *F.Supp.* 615, 621 (D.S.C.1971); *Carnes v. Smith,* 236 *Ga.* 30, 222 *S.E.*2d 322, 329, *cert.* denied 429 *U.S.* 868, 97 *S.Ct.* 180, 50 *L.Ed.*2d 148 (1976); *Oklahoma Dist. Council v. New Hope Assembly of God,* 597 *P.*2d 1211, 1215 (Sup.Ct.Okl.1979).

The primary issue in this case is whether the term "Christian Science Church" is generic or descriptive. Generic terms "embrace an entire class of products or services, not all of which necessarily emanate from the same source." 3 R. Callman, *Unfair Competition, Trademarks & Monopolies* § 18.03 at 7 (4th ed. 1983) (hereinafter Callman). A descriptive term, on the other hand, relates information about the characteristics, ingredients, qualities, purpose, or function of a product. *Application of Abcor Development Corp.,* 588 *F.*2d 811, 813 (CCPA 1978); *Norm Thompson Outfitters, Inc. v. General Motors Corp.,* 448 *F.*2d 1293, 1295 (9th Cir.1971). It has generally been said that a generic term can never be protected, while a descriptive term can be protected if it has acquired "secondary meaning"—i.e., the primary significance of the term is the producer rather than the product. *See, e.g., Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 *F.*2d 4, 9 (2d Cir.1976).

Courts have applied a confusing array of tests and standards to determine whether a term is generic or descriptive. One test considers whether the proposed mark is an adjective or a noun. *See* Callman, *supra,* ¶ 18.03 at 9 ("The typical descriptive term is an adjective, rather than a noun."). A second test looks to whether the product is its own "genus" or a member of a "species." *See Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* 537 *F.*2d at 9 ("A generic term is one that refers, or has come to be understood as referring to the genus of which the particular product is a species."). This approach has been severely criticized and was a catalyst for the 1984 amend-

ment to the Lanham Act. *See S.Rep.* No. 627, 98th Cong. 2d Sess. 9 (1984) *reprinted* in 1984 U.S.Code Cong. & Ad.News, 5718, 5726 (hereinafter *S.Rep.*) ("The factual analysis of whether a product is its own genus or a member of a species is highly confusing. Therefore, the proposed text clarifies the statute to make it clear that the test ... should not be used in future trademark proceedings"). Another test is whether there exists an alternative name for the product. *See Primal Feeling Center, Inc. v. Janov,* 201 *U.S.P.Q.* 44, 50 (TTAB 1978) ("Primal Therapy" held to be generic because court found it impossible to talk about this method of therapy without using the name "Primal Therapy.").

All these approaches fail because they attempt to apply mechanistic tests without properly analyzing the underlying facts and circumstances of each case. As one court cautioned, there is a

> decided tendency in trademark cases to argue about the legal labels rather than the underlying analytical inquiries those labels are designed to trigger. The labels themselves are merely springboards for analysis, not a substitute for it. The point is a basic one, but bears repeating, for it is all too often forgotten when the law is reduced to a few conclusory classifications: such abstract categories are analytical touchstones for a much more sophisticated inquiry. Moreover, the precise wording of the verbal summary is necessarily tied to the factual context which spawned the verbal formula, and thus will not be particularly salient in a myriad of factual settings.
>
> [*Walt-West Enterprises, Inc. v. Gannett Co., Inc.,* 695 *F.*2d 1050, 1057 (7th Cir.1982).]

I believe that the majority's reliance on *In re Bailey Meter Co.,* 102 *F.*2d 843 (CCPA 1939), *see* Ante at 306–307, embodies the type of mechanistic approach criticized by the Seventh Circuit in *Walt-West.* The *Bailey* court found that "Boiler Meter" was a generic term for meters used in connection with boilers. But a court could just as easily construe "Boiler Meter" as a term describing the type of meter at issue. *Cf.* Callman, *supra,* § 18.03 at 9 (the term "blue automobile" can be viewed as a generic term for all automobiles that are blue or as a descriptive term relating the color of particular cars). The *Bailey* court's reliance on manipulable semantic distinctions

serves only to obscure the fundamental issue in trademark law—what is the primary significance of the term in the minds of potential consumers?

The "primary significance" test was first enunciated by Judge Learned Hand in *Bayer Co., Inc. v. United Drug Co.*, 272 *F.* 505, 509 (2d Cir.1921): "The single question, as I view it, in all these cases, is merely one of fact: What do the buyers understand by the word whose use the parties are contending?" While *Bayer* was a trademark cancellation case, the "public perception" test has been applied in noncancellation cases as well. *See, e.g., Kellogg Co. v. National Biscuit Co.*, 305 *U.S.* 111, 116, 118, 59 *S.Ct.* 109, 112, 113, 83 *L.Ed.* 73, 77, 78 (1938) ("Shredded Wheat" classified as generic because it "is the term by which the biscuit in pillow-shaped form is generally known by the public"; for "Shredded Wheat" to be protected, plaintiff "must show that the primary significance of the term in the minds of the consuming public is not the product but the producer"); *Application of Abcor Dev. Corp., supra*, 588 *F.*2d at 814 (emphasis in original) ("descriptiveness of a mark ... is to be determined from the standpoint of *the average prospective purchaser*"); *Application of Andes Candies, Inc.*, 478 *F.* 2d 1264, 1266 (CCPA 1973) (quoting *Application of Automatic Radio Mfg. Co.*, 404 *F.*2d 1391, 1396 (CCPA 1969)) ("one must find out how people in the trade and the purchasers use the terms with respect to the involved goods in order to determine whether or not they are descriptive"); *see also* Callman, *supra*, § 18.04 at 13 (footnotes omitted) ("Whether a particular word is understood as descriptive will be determined by the reaction of those to whom the trademark is directed in the marketplace. If a considerable portion of the purchasing public considers the word descriptive, then it is so ....").

This focus on the meaning of the term to the public must underlie any true determination of whether a mark is generic and therefore unprotectible. The issue of genericness can arise in many contexts and should logically be governed by a consist-

ent approach, whether it is raised affirmatively to challenge a mark or defensively to defeat a charge of ínfringement.

The primary significance of a term depends upon the use to which that term is put. A term may be generic when applied to one product and descriptive, suggestive, or arbitrary when applied to another product. *Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* 537 *F.*2d at 9 n. 6 ("To take a familiar example 'Ivory' would be generic when used to describe a product made from the tusks of elephants but arbitrary as applied to soap"). Therefore, the majority's conclusion that "Christian Science" is generic when used to refer to the religion founded by Mary Baker Eddy,[3] does not answer the question whether "Christian Science" is generic or descriptive when used to name a church.

The "primary significance" test makes it unnecessary to engage in "secondary meaning" analysis. Traditionally, courts have said that a descriptive term is protected only if the primary significance of the term in the minds of the public is the producer rather than the product. *See, e.g., Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* 537 *F.*2d at 9. Since the public perception test for classifying a term as descriptive or generic focuses upon the primary significance of the term, no separate secondary meaning analysis is needed.

## II

Whether a mark is generic or descriptive is a question of fact. *Anheuser-Busch, Inc. v. Stroh Brewery Co.,* 750 *F.*2d 631, 635 (8th Cir.1984); *WSM, Inc. v. Hilton,* 724 *F.*2d 1320, 1326 (8th Cir.1984); *Soweco, Inc. v. Shell Oil Co.,* 617 *F.*2d 1178, 1183 n. 12 (5th Cir.1980), *cert.* denied, 450 *U.S.* 981, 101 *S.Ct.* 1516, 67 *L.Ed.*2d 816 (1981); *Salton, Inc. v. Cornwall Corp.,* 477 *F.Supp.* 975, 986 (D.N.J.1979); Callman, *supra,* § 18.03 at 10 n. 40 (Cumm.Supp.1986). I therefore give great deference to the findings made by the trial court. Such findings are considered

---

[3] I do not express any opinion on this issue.

binding on appeal when supported by adequate, substantial, and credible evidence. Only when factual findings are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice" should we disturb the findings on appeal. *Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 *N.J.* 474, 484 (1974) (quoting *Fagliarone v. Twp. of N. Bergen*, 78 *N.J.Super.* 154, 155 (App.Div.), certif. denied, 40 *N.J.* 221 (1963)).

The trial court's finding that for approximately the last 100 years the primary significance of the term "Christian Science Church" has been to signify a church affiliated with the Mother Church is amply supported by the evidence in this case. During the eight day trial plaintiffs introduced extensive evidence in the form of testimony from five witnesses. One of these witnesses, Professor Wilson, the Collord Professor of Religion at Princeton University, testified that the Christian Science Church is "quite extraordinary" in its "highly associative nature, i.e., the strong links between the Mother Church, its affiliated churches, service organizations and publication[s]." He further testified that "the predominant, prevailing, almost exclusive" usage of "Christian Science Church" is to refer to "the Mother Church in Boston, branch churches affiliated with it, and [its] other organizations as well." Professor Wilson's testimony was confirmed by extensive documentary evidence introduced by plaintiffs, including dictionary listings, magazines, newspapers, and government publications, all indicating that the term "Christian Science Church" is widely recognized as referring to churches affiliated with the Mother Church.

There was also evidence to indicate that the term "Christian Science" has affiliative significance when used to describe other activities engaged in by plaintiffs. Plaintiffs own registered trademarks that incorporate the phrase "Christian Science" for the following publications: *The Christian Science Monitor, The Christian Science Journal, Christian Science Quarterly, Christian Science Sentinel,* and *The Herald of Christian Science.* Plaintiffs also own federally registered trademarks in

the term "Christian Science" for library services—namely, providing and maintaining reading rooms where religious writings, publications, and recordings are available. Even the Appellate Division would afford protection to the Mother Church for the use of the term "Christian Science Reading Room," recognizing that the term is descriptive and has acquired a secondary meaning. 199 *N.J.Super.* at 171. Under Section 7(b) of the Lanham Act each of plaintiffs' certificates of registration is

> prima facie evidence of the validity of the registration, registrant's ownership of the mark, and of registrant's exclusive right to use the mark in commerce in connection with the goods or services specified in the certificate.... [15 U.S.C.A. § 1057(b).]

The validity of these marks is not disputed. In addition, plaintiffs introduced evidence of numerous additional "Christian Science" organizations and entities known to the public to be affiliated with the Mother Church: Christian Science Committees on Publication, the Christian Science Board of Education, the Christian Science Board of Leadership, and Christian Science Armed Forces. These uses of the term "Christian Science" support the trial court's finding that its primary significance is source identification with the Mother Church.

Without any explanation, the majority of the Appellate Division rejected the trial court's finding on these points. Instead, it merely concluded, without pointing to any evidence, that the term "Christian Science," when used in the name of defendants' church, is generic because plaintiffs failed to show that the primary significance of the term in the mind of the public is the producer (Mother Church) and not the product (the religion). 199 *N.J.Super.* at 171. A major fallacy in the Appellate Division's opinion, as well as this Court's majority opinion, is the failure to recognize that a term may be a dual-mark and still be protectible. In addition to clarifying the test for genericness, the 1984 Lanham Act amendments and accompanying Senate Report addressed particular concerns raised by "dual-marks"— marks that may serve to identify *both* the product and the producer. It is this very potential for dual identification that necessitates an inquiry into the *primary* function of a mark

(there would be no "primary" function if there were only one function).  The mere fact that a mark has come to identify a product does not mean it is not entitled to protection.  It is especially likely, when a product is unique, that its trademark will indicate the product as well as the producer.  "But this is not conclusive of whether the mark is generic.  The salient question is the primary significance of the term to the consumer.  If the term indicates a product of a single producer to the consumer, it is a valid trademark." *S.Rep., supra,* 1984 U.S. Code Cong. & Ad.News at 5722.

In sum, there is more than adequate evidence to establish that the public's understanding of the term "Christian Science Church" for the last hundred years has been to identify a particular church organization with the Mother Church, and its affiliated churches, publications, and service organizations.  This conclusion is supported by direct evidence of the affiliative use of the term "Christian Science" by the public to identify plaintiffs, churches, publications, reading rooms, and other organizations and the indirect documentary evidence submitted by the plaintiffs.

The fact that "Christian Science Church" is not the "official" name of the Mother Church has no effect on whether the term is protected.  Unofficial names are protected if their primary purpose is source-denoting.  *See, e.g., Volkswagenwerk, AG, v. Smith,* 471 *F.Supp.* 385 (D.N.M.1979) (the registered marks "Bug," "Beetle," and "VW" were protectible marks even though the "official" name of plaintiffs car was "Volkswagen"); *Metropolitan Opera Ass'n Inc. v. Metropolitan Artists, Inc.,* 27 *Misc.*2d 572, 212 *N.Y.S.*2d 435 (Sup.Ct.1961) (the term "The Met" was protectible even though the "official" name of plaintiff organization was "Metropolitan Opera Association").

### III

Having determined that "Christian Science Church" is protected under trademark law, I would next inquire whether the

name of defendants' church is sufficiently similar to that of plaintiffs' Church to cause a danger of confusion. It is not necessary that plaintiffs prove actual confusion; it is necessary only that they prove a likelihood of confusion. *Pizzeria Uno Corp. v. Temple*, 747 *F.*2d 1522, 1527 (4th Cir.1984); *United States Jaycees v. Philadelphia Jaycees*, 639 *F.*2d 134, 142 (3rd Cir.1981); *Scarves By Vera, Inc. v. Todo Imports Ltd.*, 544 *F.* 2d 1167, 1175 (2d Cir.1976). Again, likelihood of confusion is a factual question. *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 *F.*2d 112, 115 (2d Cir.1984); *John H. Harland Co. v. Clarke Checks, Inc.*, 711 *F.*2d 966, 973 (11th Cir.1983); *Better Business Bureau of Metropolitan Houston, Inc. v. Medical Directors, Inc.*, 681 *F.*2d 397, 400 (5th Cir.1982). And, again, I conclude that there is sufficient evidence to support the trial court's finding that defendants' use of the words "Christian Science Church" in the name of their church creates the danger that the public will confuse their church with plaintiffs' Church.

The phrase "of Plainfield, New Jersey" merely denotes the location of the Church and does nothing to indicate that defendants are unaffiliated with plaintiffs. The word "Independent" may go unnoticed or unused by those referring to the church. Moreover, the term is an ambiguous one that does not clearly indicate that defendants have no connection with plaintiffs. Other courts have held that addition of the word "independent" or similar modifying term to a protected name is insufficient to avoid a likelihood of confusion. *See Carnes v. Smith, supra,* 236 *Ga.* 30, 222 *S.E.*2d 322 (former branch of The United Methodist Church whose name had been "Noahs Ark Methodist Church" enjoined from using name "Noah's Ark Methodist Church (Independent)); *Lutheran Free Church v. Lutheran Free Church (Not Merged)*, 237 *Minn.* 332, 141 *N.W.*2d 827 (1966) (addition of the parenthetical "(Not Merged)" to protected name of church insufficient to avoid likelihood of confusion); *Talbot v. Independent Order of Owls*, 220 *F.* 660 (8th Cir.1915)

(defendants enjoined from using name "Independent Order of Arks").

I would, however, allow defendants to use the name "Plainfield Community Church—An Independent Church Practicing Christian Science." Here, the primary name of the church is "Plainfield Community Church" and the remainder of the title is merely an explanatory phrase describing the church. The phrase "Christian Science" is used to refer to the religion rather than name the Church. I believe that defendants' proposed name is sufficiently distinct from the name of plaintiffs' church to avoid a danger of confusion in the minds of the public.

## IV

The result I reach today finds support in *Jandron v. Zuendel*, 139 *F.Supp.* 887 (N.D.Ohio 1955). In that case, the Mother Church sought to enjoin members of the Third Church of Christ, Scientist, in Akron, Ohio from using the term "Church of Christ, Scientist," "Christian Science Church," or any misleading variation of these words in their name. The court concluded that the term " 'Christian Science Church' has one meaning, i.e. that it is a bona fide church of the Christian Science denomination related to The Mother Church." *Id.* at 889. The court stressed that the injunction was necessary to "prevent defendants from appropriating to themselves the good will and identity which, in the public mind, attach to the term 'Church of Christ, Scientist,' or 'Christian Science Church.' " *Id.* at 889.

The *Jandron* court relied primarily on *Purcell v. Summers*, 145 *F.*2d 979 (4th Cir.1944), wherein defendants broke away from the Methodist Episcopal Church, South, and set up a "rival" church with the same name. The court enjoined defendants from using this name because of the confusion it might cause in the minds of the public. *Purcell* involved the use of an identical name, but I think it is clear from the court's

concern with the danger of confusion that it would have enjoined defendants' use of a different name if it were similar enough to plaintiffs' name to mislead the public. The court recognized that some uses of the words "Methodist" and "Episcopal" might be generic. *Id.* at 988. The court stressed, however, that "defendants are not proposing to use either of these words in a new name so different from the old that no confusion could result." *Id.*

The majority's reliance on *McDaniel v. Mirza Ahmad Sahrab,* 27 *N.Y.S.*2d 525 (Sup.Ct.), aff'd without published opinion, 262 *A.D.* 838, 29 *N.Y.S.*2d 509 (1941), *New Thought Church v. Chapin,* 159 *A.D.* 723, 144 *N.Y.S.* 1026 (1913), *Board of Provincial Elders of the Moravian Church v. Jones,* 273 *N.C.* 174, 159 *S.E.*2d 545 (1968), and *Rosicrucian Fellowship v. Rosicrucian Fellowship Non-Sectarian Church,* 39 *Cal.*2d 121, 245 *P.* 2d 481 (1952), *cert.* denied, 345 *U.S.* 938, 73 *S.Ct.* 828, 97 *L.Ed.* 1365 (1953) is misplaced.

In *McDaniel,* plaintiffs sought to enjoin defendants from using the term "Baha'i" in connection with their meetings, lectures, classes, social gatherings, and other activities. There is no indication in the court's opinion that plaintiffs showed that any particular application of the word "Baha'i" had affiliative significance. In essence, plaintiffs attempted to secure an exclusive right to use the name of their religion, and the court correctly ruled that they could not do so. *McDaniel* is thus inapposite because in the present case plaintiffs are not trying to prevent all uses of the words "Christian Science"; they are merely seeking to protect the name of their church. In *National Spiritual Assembly of the Baha'is Under the Hereditary Guardianship Inc. v. National Spiritual Assembly of the Baha'is* 150 *U.S.P.Q.* 346 (N.D.Ill.1966), the Baha'i organization did try to enjoin a specific use of the term "Baha'i" that had affiliative significance. The court held that the name "National Assembly of the Baha'is" was protected.

The decision in *New Thought* seems to have been based, at least in part, on the court's assumption that a combination of generic words cannot be protected:

> It is conceded that it cannot successfully claim a monopoly of the words "new thought," or the word "church," but it claims the right to monopolize the combination of these words. This claim seems to us untenable. The words are all generic in character and of common use and are neither peculiar, distinctive, nor descriptive. [159 *A.D.* at 724, 144 *N.Y.S.* at 1027.]

This assumption is clearly against the weight of authority. *See, e.g., In re National Data Corp.,* 753 *F.*2d 1056 (Fed.Cir. 1985) (the term "The Cash Management Exchange" must be considered as a whole); *Specialty Brands, Inc. v. Coffee Bean Distribs.,* 748 *F.*2d 669 (Fed.Cir.1984) (the term "Spice Islands" as applied to tea must be considered as a whole).

In *Board of Elders,* the Supreme Court of North Carolina reversed a lower court order temporarily enjoining defendants from using the term "Moravian" in the name of their church. The court based its decision on a finding that plaintiff had failed to prove a danger of imminent irreparable injury sufficient to outweigh the burden a temporary injunction would place on defendants. 273 *N.C* at 182–83, 159 *S.E.*2d at 552. The court emphasized that it did not reach the ultimate question of whether the term "Moravian" was protected by trademark law:

> It also cannot be determined upon this record whether the word "Moravian," used in connection with a church, is a generic, descriptive term primarily signifying acceptance of certain doctrines, sacramental ceremonies and theological beliefs, or is a word which primarily signifies an affiliation with the plaintiff and its associated groups.
>
> \*    \*    \*    \*    \*    \*    \*    \*
>
> The defendants should not be enjoined from their use of "Moravian" in the name of their church until the matter is finally heard and the exclusive right of the plaintiff, and its affiliated groups, to use it is established by evidence. [*Id.* at 185, 159 *S.E.*2d at 553–54.]

Finally, *Rosicrucian Fellowship* was not a trademark case. That case concerned primarily the allocation of property rights between two "rival" groups practicing the "Rosicrucian Philosophy." The trial court issued an order, *inter alia,* enjoining

defendant organization from using the name "Rosicrucian Fellowship." The California District Court of Appeals reversed on the ground that defendant was entitled to use the name under the terms of a contract between it and the widow of the organization's founder. 220 *P.*2d 66, 76 (Cal.App.1950). The Supreme Court of California affirmed without any discussion of trademark law. 39 *Cal.*2d 121, 245 *P.*2d 481 (1952). Since trademark law played no part in the court's decision, *Rosicrucian Fellowship* is not applicable to the present case.

## V

Granting protection to the name "Christian Science Church" would not violate defendants' first amendment rights. Defendants are free to practice their religion and can use the term "Christian Science" in any way that does not infringe on plaintiffs' mark. Trademark infringement is not protected by the Constitution. *See Purcell v. Summers, supra,* 145 *F.*2d at 987; *Jandron v. Zuendel, supra,* 139 *F.Supp.* at 889.

For the reasons stated above, I would reverse the judgment of the Appellate Division and reinstate the order entered by the trial court.

Justice O'HERN joins in this opinion.

*For affirmance* —Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK and STEIN—5.

*For reversal*—Justices O'HERN and GARIBALDI—2.