THIS DISPOSITION *IS CITABLE* AS PRECEDENT OF THE TTAB

May 30, 2002

Paper No. 19
csl

**UNITED STATES PATENT AND TRADEMARK OFFICE**

————

**Trademark Trial and Appeal Board**

————

In re The American Academy of Facial Plastic and
Reconstructive Surgery

Serial No. 75/215,519

————

Elisabeth G. Lowry of Smith, Gambrell & Russell for applicant.

Wanda Kay Price, Trademark Examining Attorney, Law Office 111
(Craig D. Taylor, Managing Attorney).

————

Before Simms, Hanak and Bucher, Administrative Trademark
Judges.

Opinion by Simms, Administrative Trademark Judge:

The American Academy of Facial Plastic and Reconstructive

Surgery (applicant), a non-profit Illinois corporation, has

appealed from the final refusal of the Trademark Examining

Attorney to register on the Principal Register the mark shown

below:



for the following services:

> training in plastic facial and reconstructive surgery techniques and practices and distributing course material in connection therewith, in International Class 41;
>
> association services, namely, promoting the interests of facial plastic surgeons and reconstructive surgeons, research in the field of plastic surgery and reconstructive surgery and related basic sciences, namely, anatomy, pathology, biology, chemistry, physiology, and wound healing, in International Class 42; and
>
> indicating membership in an association of facial plastic and reconstructive surgeons, in International Class 200.[1]

The Examining Attorney has refused registration of applicant's mark under Section 2(e)(1) of the Act, 15 USC §1052(e)(1), on the ground that applicant's mark is generic for its services, or, if not generic, merely descriptive and lacking in acquired distinctiveness under Section 2(f) of the Act, 15 USC §1052(f).

We affirm.

---

[1] Application Serial No. 75/215,519, filed December 19, 1996, claiming use in the first two classes as early as 1988 and in the last class as early as 1991. In the application, applicant indicates that it is exercising legitimate control over use of the collective membership mark. Applicant has disclaimed exclusive rights in the words "FACIAL PLASTIC SURGERY" apart from the mark as shown. Although applicant has disclaimed these words in its asserted mark, because an applicant may disclaim, among other matter, merely descriptive as well as generic matter, and because applicant has not otherwise conceded that these words are generic for its services, this disclaimer does not constitute an admission that the words themselves are generic. Accordingly, we make an independent determination of the issue of genericness of the words which comprise almost the entirety of applicant's asserted mark.

It is the Examining Attorney's position that "facial plastic surgery" is a common phrase within the medical field used to denote the medical procedure of cosmetic and reconstructive surgery of the face, neck and head; that is, it is a specialized field of plastic surgery. As such, she argues that it is incapable of identifying applicant's services and distinguishing these services from those of others. Moreover, the Trademark Examining Attorney contends that applicant's display of these generic or descriptive words is a common arrangement of the words having an indistinctive font style featuring minimal design "underlining." In other words, the Examining Attorney argues that the asserted mark is not a distinctive display of generic or descriptive matter creating a commercial impression in and of itself.

While the Examining Attorney argues that applicant's asserted mark is generic and that no amount of use and promotion can make it a registrable mark, in other words, that it is not capable of acquiring distinctiveness, it is also her position that, because applicant's asserted mark is highly descriptive of its services, even if it were capable of identifying applicant's services, the evidence of acquired distinctiveness is insufficient. The Examining Attorney notes that applicant has recognized that the words in its mark describe certain surgical procedures and has disclaimed these

words.  The Examining Attorney contends that where there is a high degree of descriptiveness, purchasers are less apt to discern the source of the services identified by that asserted mark as emanating from any one entity.  Although applicant's members are sought after because of their specialty in facial plastic surgery, this does not mean that applicant's asserted mark is distinctive, according to the Examining Attorney.  The Examining Attorney also criticized applicant's evidence as from a relatively small number of physicians and that some of this evidence is subject to bias.  In conclusion, the Examining Attorney argues that applicant's asserted mark is unregistrable for its services of training facial plastic surgeons, promoting the interests of those surgeons and indicating membership in applicant's association.

The Examining Attorney has made of record the following excerpts, among other stories retrieved, from the Nexis computer database showing the words "facial plastic surgery" used generically:

> The Center for Sight also specializes in retina surgery, laser vision correction, and facial plastic surgery procedures to remove bags under eyes and to correct droopy eyelids.
>
> Sarasota Herald-Tribune, March 20, 1999
>
> *   *   *   *   *   *   *   *   *   *
>
> The center also offers facial plastic surgery by local physicians who specialize in cosmetic and reconstructive surgery.

Chattanooga Times and Free Press, March 14, 1999

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

> If men are chicken, they have good reason to be. Aesthetically, facial plastic surgery is trickier on men.

The New York Times, February 17, 1999

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

> Nachlas is a past president of the Palm Beach County Medical Society, and specializes in facial plastic surgery and surgery of the nose.

Sun-Sentinel, January 8, 1999

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

> … Success to transform and rejuvenate damaged aging skin, has made laser resurfacing one of the most requested cosmetic procedures in facial plastic surgery.

Plastic Surgical Nursing, December 22, 1998

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

> Parents should consider the following guidelines when their child needs or desires facial plastic surgery …

Indianapolis Star, December 9, 1998

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

> The surgeries "have restored his voice and his abilities to eat," Dr. Mark Shikowitz, associate chairman of Otolaryngology and facial plastic surgery said yesterday.

New York Post, December 3, 1998

The specimens and other material of record show that applicant has sponsored numerous conferences and educational seminars on facial plastic surgery, such as the "Fifth Annual Winter Symposium on the Advances of Facial Plastic Surgery" held in September 1997, and the "Seventh International

Symposium of Facial Plastic Surgery" in June 1998. Another of applicant's brochures indicates that applicant is the world's largest association of facial plastic and reconstructive surgeons.

Applicant, on the other hand, maintains that the Examining Attorney has failed to meet her burden of showing that its mark is generic for applicant's services. In this regard, applicant argues that the Examining Attorney must demonstrate, under existing precedent, that its mark is understood by the relevant public to refer primarily to the genus of applicant's services. Applicant contends that the articles of record do not show the words "facial plastic surgery" are generic for applicant's training, association and collective membership services. Moreover, if descriptive words are displayed with a distinctive design, they may be registered with a disclaimer of the literal components. Here, it is applicant's position that the words FACIAL PLASTIC SURGERY are displayed flush with the left margin in a "cascading stairstep design" with the word "SURGERY" underscored by a line. Applicant argues that there are many ways to arrange these words and that its mark presents "a more complicated and distinctive design element" (brief, 8) and "a far more ornate and distinctive design than exists in other

marks which have been approved by the TTAB." (Response, filed January 9, 1998, 6).

In addition, while applicant admits that the words in its mark are descriptive of surgical procedures provided by medical practitioners, it is applicant's position that due to the acquired distinctiveness of the presentation of its mark, including the design elements, there is significant public recognition of this composite mark. Applicant notes that there has been continuous and substantially exclusive use of its asserted mark for at least ten years in the case of its collective membership mark and at least thirteen years in connection with its training and association services. According to applicant, this use constitutes *prima facie* evidence of acquired distinctiveness. Applicant points to the evidence of record including letters from member doctors, from patients and from exhibitors at applicant's educational seminars and conferences attesting to their recognition of applicant's mark as an indication of origin of applicant's educational and promotional activities as well as its member surgeons.[2]

---

[2] For example, the similarly worded letters from patients indicate that their selection of doctors was influenced by the surgeon's membership in applicant, identified by the mark sought to be registered, and that they have come to view applicant's mark as a symbol which identifies member surgeons as well as applicant's educational and promotional activities. One patient indicates that her selection of a facial plastic surgeon was made easier by the use

Applicant has also made of record a letter from its executive vice president indicating:  that applicant has 2,700 member surgeons; that applicant distributes over 300,000 newsletters (*Facial Plastic Times*) and brochures bearing the mark each year; that applicant distributes an exhibitor prospectus bearing the mark to 350 surgical equipment and supply companies; and that an annual membership directory bearing the mark is sent to all its member surgeons.  The annual expenditures for these promotional and educational materials, and its advertisements in medical journals and trade publications, average around $175,000, which is about 45% of applicant's entire budget.  According to applicant,

---

of applicant's mark.  Another letter states that applicant's Yellow Pages listing of facial plastic surgeons helped select a surgeon who specialized in plastic surgery of the face.  This writer asked applicant to "keep your logo visible in all your endorsements so others like myself will be able to quickly and appropriately select a qualified facial plastic surgeon." (Exhibit 4)  A facial plastic surgeon indicates that use of applicant's logo has informed patients of his specialty training in facial plastic and reconstructive surgery and that he does not perform other types of plastic surgery. (Exhibit 5)  Another doctor states that applicant's mark has proven to be an effective tool in providing him an identity as a surgical specialist.  Another says that applicant's mark has brought more patients into his office because the public seeks out facial plastic surgeons for their specialty in facial plastic surgery.  He states that applicant's "material [bearing the mark] tremendously adds to my patients' knowledge of Facial Plastic Surgery and they are strongly ardent in identifying me as a specialist in facial plastic surgery."  Similarly worded exhibitors' letters state that they have become familiar with applicant's mark to identify applicant's member surgeons and its educational services, and that in their opinion applicant's mark has acquired distinctiveness indicating membership in applicant and identifying its educational and promotional services.

this extremely high percentage of its overall budget devoted to advertising should be given great weight in reaching our decision.[3]  Applicant has also made of record Yellow Pages advertisements of member surgeons who use applicant's mark. Applicant contends that these advertisements are exposed to millions of patients and potential patients.  Accordingly, applicant argues that its mark is well known throughout the industry and is recognized by medical practitioners, patients, non-members and medical equipment and supply companies who attend applicant's conferences, as well as the general public. Applicant argues that the use of its mark assists the general public in selecting qualified facial plastic surgeons. Accordingly, applicant asks us to reverse the Examining Attorney's refusal.  However, if the Board finds that applicant's Section 2(f) evidence is unpersuasive, applicant asks us to remand this case to the Examining Attorney so that applicant can be afforded an opportunity to consider an amendment to register this mark on the Supplemental Register.

---

[3] However, we note that even according to the author of the article that applicant cites, the specific nature of a particular market sector makes such far-ranging comparisons meaningless (e.g., general percentages of sales devoted to advertising for a national manufacturing concern are hardly instructive when one is considering the activities of a narrow and specialized trade association such as applicant's).

Upon careful consideration of this record, we conclude that applicant's asserted mark is generic for its training, association and collective membership services.

As the attorneys have noted, generic terms are terms that the relevant public understands primarily to refer to the class (or genus) of applicant's goods or services. *In re Dial-A-Mattress Operating Corp.*, 240 F.3d 1341, 57 USPQ2d 1807, 1811 (Fed. Cir. 2001); and *In re American Fertility Society*, 188 F.3d 1341, 51 USPQ2d 1832, 1836 (Fed. Cir. 1999). Such terms are incapable of functioning as trademarks denoting origin or any specific source, and are not registrable on the Principal Register under Section 2(f), or on the Supplemental Register. See, for example, *H. Marvin Ginn Corp. v. International Association of Fire Chiefs*, 782 F.2d 987, 228 USPQ 528, 530 (Fed. Cir. 1986)("A generic term … can never be registered as a trademark because such a term is 'merely descriptive' within the meaning of §2(e)(1) and is incapable of acquiring *de jure* distinctiveness under §2(f)") and cases cited therein.

The two-part test used to determine whether a designation is generic asks: (1) What is the class of goods or services, and (2) Does the relevant public understand the designation primarily to refer to that class of goods or services? *See*

*Ginn, supra.* The test turns upon the primary significance that the term would have to the relevant public.

The Examining Attorney has the burden of proving that a term is generic by clear evidence. *In re American Fertility Society*, *supra*, 51 USPQ2d at 1835; and *In re Merrill Lynch, Pierce, Fenner & Smith Inc.,* 828 F.2d 1567, 4 USPQ2d 1141 (Fed. Cir. 1987). Evidence of the public's understanding of a term can be obtained from any competent source, including dictionary definitions, research databases, newspapers and other publications. *In re Northland Aluminum Products, Inc.,* 777 F.2d 1556, 227 USPQ 961 (Fed. Cir. 1985)(BUNDT designates a type of cake, held generic for ring cake mix).

Where the mark is a phrase, the Examining Attorney cannot simply cite definitions and generic uses of the individual components of the mark, but must provide evidence of the meaning of the composite mark as a whole. Here, the Examining Attorney has made of record evidence that the phrase "facial plastic surgery" is a recognized field of surgical specialization. As such, it may be regarded as a name of a class or category of surgery. The record also shows that this term has been widely used and that the relevant public would understand this phrase as designating a type of plastic surgery. As used in connection with training in the field of facial plastic surgery, promoting the interests of facial

plastic surgeons and research in this field, as well as indicating membership of facial plastic surgeons, the words FACIAL PLASTIC SURGERY are generic, indicating only the field of specialty in which these services are rendered.  See, for example, *In re A La Vieille Russie, Inc.*, 60 USPQ2d 1895 (TTAB 2001)(RUSSIANART generic for dealership services in the field of fine art, antiques, furniture and jewelry); *In re Log Cabin Homes Ltd.*, 52 USPQ2d 1206 (TTAB 1999)(LOG CABIN HOMES generic for architectural design of buildings and retail outlets selling kits for building log homes); *In re Web Communications*, 49 USPQ2d 1478 (TTAB 1998)(WEB COMMUNICATIONS generic for consulting services to businesses seeking to establish sites on a global computer network).

However, even if we were to find this phrase not to be a generic one for applicant's services, we would hold that, in view of the very highly descriptive nature of these words, applicant's evidence of acquired distinctiveness is insufficient to show that these words have come to be recognized as an indication of origin of the services in applicant.  See *Yamaha International Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 6 USPQ2d 1001, 1008 (Fed. Cir. 1988)(the greater the degree of descriptiveness a term has, the heavier the burden of proof of acquired distinctiveness).  The words FACIAL PLASTIC SURGERY for training, association, research and

collective membership services in the field of facial plastic surgery are clearly very highly descriptive of the nature and subject matter of applicant's services rendered to facial plastic surgeons, and applicant's evidence of acquired distinctiveness fails to demonstrate that these words alone have become associated with any one entity. See, for example, *In re Stanbel Inc.*, 16 USPQ2d 1469 (TTAB 1990), *aff'd* 20 USPQ2d 1319 (Fed. Cir. 1991)(ICE PAK for reusable ice substitute for use in food and beverage coolers held generic; even assuming a contrary holding, evidence submitted by applicant deemed insufficient to establish acquired distinctiveness); and *In re Paint Products Co.*, 8 USPQ2d 1863 (TTAB 1988)(PAINT PRODUCTS CO. for "interior and exterior paints and coatings, namely, alkyd, oil, latex, urethane and epoxy based paints and coatings" held incapable of becoming distinctive; even assuming the term could function as a mark, applicant's evidence deemed insufficient to establish acquired distinctiveness). Cf. *In re American Fertility Society*, *supra* (SOCIETY FOR REPRODUCTIVE MEDICINE held not generic for association services in the field of reproductive medicine).

Finally, we turn to the question of whether applicant is entitled to registration because its asserted mark is a distinctive display of unregistrable and disclaimed matter. In this regard, it is possible to register a composite word

and design mark even if the literal portion consists of a generic name, if the wording is displayed in very distinctive lettering or is accompanied by a distinctive design.  J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §12:40 (Fourth Edition Dec. 2001 Release).  In other words, a display of descriptive, generic or otherwise unregistrable matter is not registrable on the Principal Register unless the stylization of the words or the accompanying design features of the asserted mark create an impression on purchasers separate and apart from the impression made by the words themselves, or unless it can be shown by evidence that the particular display which applicant uses has acquired distinctiveness.  See, for example, *In re Benetton Group S.p.A.,* 48 USPQ2d 1214, 1216 (TTAB 1998)(green background tag for clothing); *In re Anton/Bauer Inc.,* 7 USPQ2d 1380, 1381 (TTAB 1988) (parallelogram used as background design for applicant's housemark, the words ANTON/BAUER); and *In re Miller Brewing Company,* 226 USPQ 666, 668 (TTAB 1985)(display of "Lite" for beer held registrable on the basis of acquired distinctiveness).  If the background or other design elements of the mark are inherently distinctive, the mark may be registered without evidence of acquired distinctiveness.  However, ordinary geometric shapes such as circles, ovals, squares, stars, etc., are generally regarded as nondistinctive

and protectable only upon proof of acquired distinctiveness. *In re Anton/Bauer, supra.* Also, subject matter that is merely a decorative feature generally does not identify and distinguish applicant's goods and, thus, does not function as a trademark.

We compare the distinctiveness of the presentation herein with earlier cases where this question has been considered. For example, the Board held that the display of the generic word "Lite" for cheese was not registrable because "there is nothing unusual or even different in the formation of the letters" which would make them distinctive. *See In re Pollio Dairy Products Corp.,* 8 USPQ2d 2012 (TTAB 1988).



Similarly, the style of lettering used in the generic name  "bundt" was held not to be a distinctive display. *See In re Northland Aluminum Products, Inc., supra.* Likewise, when the generic term "MICROWAVE TURNTABLE" was presented in plain block lettering with "MICROWAVE" in smaller letters  appearing over the left-hand side of the word "TURNTABLE," the resulting composite was held not to be registrable on the Supplemental Register. *In re Anchor*

*Hocking Corp.,* 223 USPQ 85 (TTAB 1984). When an earlier applicant had filled in the portions of some of the letters in



the descriptive term "designers/fabric," this particular display was found not to be sufficiently distinctive to create a separate commercial impression. *In re S.D. Fabrics, Inc.,* 223 USPQ 54 (TTAB 1984). Despite the slightly slanted letters and the capitalized letters "C" and "A," the

![CouriAire]

descriptive term "COURIAIRE" was found not to be sufficiently distinctive to create a separate commercial impression. See *In re Couriaire Express International, Inc.,* 222 USPQ 365 (TTAB 1984). This Board

![Body Soap]

found the generic term "BODY SOAP" shown in ordinary and undistinguished typeface not registrable on the Supplemental Register. *In re Cosmetic Factory, Inc.,* 220 USPQ 1103 (TTAB 1983).

Where the goods were described as made of microdenier, even the interlocking letters "o" and "d" and the fine font making up the letters were deemed not to

![microdenier]

create a commercial impression separate and apart from the descriptive term MICRODENIER. *See In re Guilford Mills Inc.,* 33 USPQ2d 1042, 1043 (TTAB 1994). Finally, a display of the generic term "24 K Gold" for

jewelry was found not to be registrable.  See *In re Project Five, Inc.,* 209 USPQ 423 (TTAB 1980).  In each of these reported cases, the features of the display could not overcome the inherent incapacity of the literal terms to serve as a source indicator.

On the other hand, on occasion, the features of the display are of such a nature that they inherently serve to distinguish the mark in its entirety, or it has been shown by competent evidence that what is sought to be registered does in fact function as a trademark to identify and distinguish applicant's goods in commerce.  These composites contain presentations of the wording that are so inventive, striking, unique or distinctive in character as to make the composite registrable, or there is evidence that the particular display of unregistrable matter has become distinctive.

For example, given the play on the "fun" aspects of applicant's food products, the distinctive display of MUFFUNS



for muffins was held registrable on the Principal Register.  *See In re Grand Metro. Foodservice,* 30 USPQ2d 1974 (TTAB 1994).

Similarly, a distinctive display of THE PIPE was held registrable for smokers'



pipes. See *In re Venturi, Inc.,* 197 USPQ 714 (TTAB 1977).

It should be remembered, however, that the inherent distinctiveness being asserted in cases of this nature is almost always in connection with the specific display of the descriptive or generic words, not the descriptive or generic words themselves, and if there is acquired distinctiveness or secondary meaning being claimed, that showing pertains to the specific display or design aspect of the asserted mark and not in the words themselves. See, for example, *In re K-T Zoe Furniture,* 16 F.3d 390, 29 USPQ2d 1787 (Fed. Cir. 1994)(" … only the script design of the words [The Sofa & Chair Company] was shown to have acquired secondary meaning").



In *Dena Corp. v. Belvedere International, Inc.,* 950 F.2d 1555, 21 USPQ2d 1047 (Fed. Cir. 1991), the Court stated that, if a mark is dominated by a descriptive and disclaimed element, that part of the mark imparts non-registrable meaning to the entire mark. The Court explained that where a mark containing insignificant elements is dominated by descriptive and unregistrable matter, the entire mark remains

Serial No. 75/215,519

unregistrable because the nonregistrable meaning is imparted to the entire mark.  The Court stated, 21 USPQ2d at 1051:

> Such a mark, in effect, has no "unregistrable component" because the dominant feature of the mark extends a nonregistrable meaning to the whole.  The entire mark becomes nonregistrable.

Here, the display of the generic words FACIAL PLASTIC SURGERY is clearly nondistinctive with the words shown one above the other in ordinary capital letters with an insignificant underscoring.  The display is nothing but ordinary in nature and does not create a commercial impression separate and apart from the unregistrable components.  The only "design" component of applicant's asserted mark is the underlining, and there is no evidence of record that specifically points to recognition of this common and prosaic feature in applicant's asserted mark as the element which potential purchasers or users of applicant's services have come to recognize as the distinctive aspect indicating origin in applicant.[4]

---

[4] The dissent draws on the mark of "the ASPRS, the other national organization of plastic surgeons" (see pp. 35 and 36, _infra_), and then presumes to know how the majority would characterize that mark. However, given that the nature of the ASPRS mark contrasts sharply with the one at issue herein, the lessons to be learned from this third-party mark are unclear.  The instant mark is dominated by literal elements that we have found to be generic.  By contrast, the mark of ASPRS appears to be a non-representational design feature without a single literal element.  Accordingly, any general principles of distinctiveness as a source-indicator that one might

Applicant makes much of the fact that its mark is displayed in a "cascading stairstep" manner.  However, we note that such a display is the natural result of displaying these words one above the other with a left justification.  In other words, with variable spaced letters, the seven-letter word "PLASTIC" extends right beyond the end of the six-letter word "FACIAL"; and, even though the word "SURGERY," like the word "PLASTIC," has seven letters, because some of the letters (e.g., the letter "G") are wider than the letters of the word "PLASTIC" (e.g., the letter "I"), the word "SURGERY" in turn extends right beyond the end of the word "PLASTIC".  See resulting display below, in Arial font:



and in a Times New Roman font:



In view of the very minimal stylization (underlining of the word <u>SURGERY</u>) of applicant's asserted mark, applicant's evidence of the exposure of this mark to the public and its

---

derive from that particular mark seem totally irrelevant to the instant dispute.

advertising expenditures of around $175,000 per year are simply insufficient to demonstrate acquired distinctiveness. In this regard, one should also remember that the association by the relevant public of a *generic* term in a nondistinctive display "sets a much higher and different standard of proof and persuasion than is required for descriptive terms." McCarthy*, supra,* §12:40. This standard of acquired distinctiveness cannot be said to have been met by applicant in its very nondistinctive display of generic matter.

Indeed, we agree with the Examining Attorney that applicant's asserted mark is incapable of acquiring distinctiveness. The evidence of purported association of a generic term with an applicant is often viewed as "*de facto* secondary meaning." McCarthy*, supra*, §12:47. See also, for example, *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 189 USPQ 759, 764 (2d Cir. 1976)("[E]ven proof of secondary meaning, by virtue of which some "merely descriptive" terms may be registered, cannot transform a generic term into a subject for trademark ….[N]o matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product the right to call an article by its name."); *A.J. Canfield Co. v.*

*Honickman,* 808 F.2d 291, 1 USPQ2d 1364 (3d Cir. 1986)(evidence that a generic term is identified with one producer proves only *de facto* secondary meaning); *Christian Science Board of Directors v. Evans*, 105 N.J. 297, 520 A.2d 1347, 2 USPQ2d 1093 (N.J.S.Ct. 1987); *Continental Airlines Inc. v. United Air Lines Inc.,* 53 USPQ2d 1385 (TTAB 2000)("Even if one has achieved *de facto* acquired distinctiveness in a generic term through promotion and advertising, the generic term is still not entitled to protection because to allow protection would 'deprive competing manufacturers of the product of the right to call an article by its name.'"); and *In re BOC Group, Inc.*, 223 USPQ 462 (TTAB 1984)(No amount of secondary meaning evidence can "rescue" a generic term. Customer letters "evidence only *de facto* secondary meaning, that is some association between the name and applicant. However, to this type of secondary meaning the law does not accord legal significance."). As Professor McCarthy indicates, *supra,* at §12:40:

> The potential competitive danger of such logo registrations of generic names is that the owners of such registrations sometimes have an inflated notion of the scope of their exclusive rights and assert them against competitors as if they owned the generic name displayed in the registration. Faced with such a registration, the businessperson who fails to seek competent legal advice may agree to cease use of the generic name, causing a

significant and unnecessary impairment of the competitive process.

Applicant's alternative request for remand for consideration on the Supplemental Register if its mark is found unregistrable on the Principal Register is denied. Trademark Rule 2.142(g) provides that an application which has been considered and decided on appeal will not be reopened except for the entry of a disclaimer, or upon order of the Commissioner, but a petition to the Commissioner to reopen an application will be considered only upon a showing of sufficient cause for consideration of any matter not already adjudicated.

Decision: The refusal of registration on the basis that applicant's mark is generic is affirmed; in the alternative, the refusal that applicant's mark is merely descriptive without acquired distinctiveness is affirmed; finally, the display of the generic words is neither inherently distinctive, nor has it acquired distinctiveness.[5]

---

[5] The dissenting opinion assumes that *all* of the nearly $175,000 in advertising and promotional expenditures is directed to promoting the asserted mark to plastic surgeons. However, this may not be the case. Over 30 percent of this figure is spent on brochures which are purchased from applicant. But the statement of applicant's executive vice president does not indicate who purchases these brochures from applicant. They may not be plastic surgeons. Some of applicant's brochures in the record are specifically identified as patient information brochures, and these would undoubtedly be purchased by surgeons to be distributed to the general public. Also, an unspecified part of applicant's budget is spent on exhibitor prospectuses (whose cost to prepare and to mail is not

- o O o -

Hanak, Administrative Trademark Judge, dissenting:

It is beyond dispute that "the burden of showing that a proposed trademark [or service mark] is generic remains with the Patent and Trademark Office." *In re Merrill Lynch*, 828 F.2d 1567, 4 USPQ2d 1141, 1143 (Fed. Cir. 1987). Moreover, it is incumbent upon the Examining Attorney to make a "substantial showing … that the matter is in fact generic." *Merrill Lynch*, 4 USPQ2d at 1143. Indeed, this substantial showing "must be based on clear evidence of generic use." *Merrill Lynch*, 4 USPQ2d at 1143. Thus, "a strong showing is required when the Office seeks to establish that a [mark] is generic." *In re K-T Zoe Furniture Inc.*, 16 F.3d 390, 29

---

indicated) mailed to 350 companies (who exhibit at applicant's meetings) four times a year. It may be, therefore, that significantly less than the $175,000 figure may be spent on materials directed to plastic surgeons. However, even if *all* of the advertising and promotional expenses were directed to plastic surgeons (and applicant does not so contend), the annual amount spent per plastic surgeon would still be only about $10 or less.

  Moreover, as indicated in footnote 2, the general public looking for surgeons specializing in facial plastic surgery as well as plastic surgeons who limit their practice to this field, may well be drawn to members of applicant's organization and to applicant's training and research services by the intrinsic information conveyed in applicant's asserted mark. Such people may choose applicant's specialized members and applicant's specialized services as opposed to general plastic surgeons and the services of other organizations which do not specialize in plastic surgery of the face. In fact, we believe that it is this recognition that the general public and others are attesting to when they indicate that applicant's asserted mark identifies members of applicant's association and applicant's services.

USPQ2d 1787, 1788 (Fed. Cir. 1994).  Moreover, any doubt whatsoever on the issue of genericness must be resolved in favor of the applicant.  *In re Waverly Inc.,* 27 USPQ2d 1620, 1624 (TTAB 1993).

Even if the USPTO makes a strong, substantial showing that a mark is perceived as generic by a majority of the American public, that strong, substantial showing is, by itself, insufficient unless the USPTO likewise makes a strong, substantial showing that the mark is perceived as generic by the <u>relevant purchasing public</u> of the services for which applicant seeks to register its mark.  *Magic Wand Inc. v. RDB Inc.,* 940 F.2d 638, 19 USPQ2d 1551, 1552-53 (Fed. Cir. 1991) ("Thus, a proper genericness inquiry focuses on the description of services set forth in the [application] …  The precedents of this court both before and after the 1984 Act have consistently applied the traditional <u>purchaser</u> understanding test.  For example, this court has stated that whether a term is entitled to trademark status turns on how the mark is understood by the <u>purchasing public</u>.")(emphasis added); *In re Montrachet S.A.,* 878 F.2d 375, 11 USPQ2d 1393, 1394 (Fed. Cir. 1989) ("Whether a term is entitled to trademark status turns on how the mark is understood by the <u>purchasing public</u>.") (emphasis added); *In re Northland Aluminum Products, Inc.,* 777 F.2d 1556, 227 USPQ 961, 963

(Fed. Cir. 1985) ("The descriptiveness of the term is determined from the viewpoint of the <u>relevant purchasing public</u>.") (emphasis added).

Applicant does <u>not</u> seek to register the mark shown below for the rendering of plastic surgery services, facial or otherwise. If it did, then the relevant purchasing public would be those ordinary Americans who have had plastic surgery or who are contemplating having plastic surgery. Rather, applicant seeks to register the mark shown below for training in plastic facial surgery; promoting the interests of facial plastic surgeons; and indicating membership in an association of facial plastic surgeons.

**FACIAL PLASTIC SURGERY**

The majority totally fails to acknowledge that the <u>relevant purchasing public</u> of the services for which applicant seeks to register the above mark <u>are plastic</u> <u>surgeons</u>. All of the evidence cited by the majority relates to how ordinary Americans perceive not applicant's mark, but rather the term "facial plastic surgery" *per se*. The USPTO has presented no evidence, much less clear and substantial evidence, showing

that plastic surgeons perceive the above mark as anything other than applicant's source identifier.

Moreover, even with regard to its extremely specialized services directed solely to facial plastic surgeons, applicant does not seek any rights whatsoever in the words "facial plastic surgery" *per se*.  Indeed, applicant has explicitly disclaimed <u>all</u> rights in these words.

The number of plastic surgeons in general is extremely limited, and the number of facial plastic surgeons is even more limited.  The American Academy of Facial Plastic and Reconstructive Surgery (applicant) has just 2,700 physician members.  The other national organization of plastic surgeons, who do not limit their practice to the face, is the American Society of Plastic and Reconstructive Surgeons, Inc. (ASPRS). The ASPRS has approximately 5,000 members.  The extremely limited numbers of plastic surgeons in general (including facial plastic surgeons) is further reflected in a survey commissioned by the ASPRS which showed that in 1997, there were fewer than 530,000 plastic surgeries performed in the United States.

The record reflects that applicant has used the mark which it seeks to register continuously for 14 years.  More importantly, in recent years applicant has spent on an annual basis approximately $175,000 in advertising and promoting the

mark which it seeks to register.  These advertising and promotion dollars have been aimed at an extremely tiny target, namely, applicant's mere 2,700 members and an additional 14,000 physicians who practice in the field of plastic surgery.  While the record does not reflect the total number of physicians who are engaged primarily or exclusively in plastic surgery, a reasonable assumption is that said number is decidedly less than 25,000.  This assumption is based on the fact that applicant has 2,700 members; that the other national association of plastic surgeons (ASPRS) has approximately 5,000 members; and on the fact that applicant targets its advertising and promotion dollars to but a mere 16,700 physicians.  In addition, the previously mentioned study commissioned by the ASPRS demonstrated that in 1997, there were fewer than 530,000 plastic surgeries performed in the United States.  Thus, it is quite reasonable to assume that there are decidedly fewer than 25,000 plastic surgeons in the United States.  If there were as many as 25,000 plastic surgeons, then this would mean that a typical plastic surgeon would perform on average but 21 plastic surgeries per year.

However, even if we were to assume that there are 25,000 plastic surgeons in the United States, this is but a tiny fraction of 1% of the overall United States population, which is well in excess of 250 million.  In other words, the overall

United States population is well over 10,000 times the size of the largest conceivable number of plastic surgeons in the United States.  This is quite significant in putting into proper perspective the $175,000 which applicant spends annually to promote the mark which it seeks to register. Multiplying 10,000 by $175,000 makes for an advertising and promotion budget of $1.75 billion.  Stated somewhat differently, applicant's annual $175,000 advertising and promotion budget targeted to a very narrow group of individuals (plastic surgeons) is the equivalent of an annual $1.75 billion advertising and promotion budget for a popular consumer product utilized by most Americans.  Of course, such extrapolations are not to be taken as precise or a reflection of exactly what happens in the real world marketplace. However, they do put into some perspective the magnitude of applicant's annual advertising and promotion budget of $175,000 directed to plastic surgeons.

In footnote 5, the majority argues that it might be possible that "significantly less" than the $175,000 advertising and promotional budget is directed to plastic surgeons.  The majority bases this assertion on two factors. First, the majority states that over 30% of the $175,000 is spent on a brochure bearing the mark, copies of which are purchased from applicant.  The majority then notes that

applicant's Executive Vice President did not indicate who purchased the brochures, the implication being that the brochures were not purchased by applicant's member facial plastic surgeons.  A review of applicant's short seven-page brochure titled Understanding Facial Plastic Surgery makes it readily apparent that this brochure is a sales tool which is used by applicant's member facial plastic surgeons in attempting to promote their services to existing and prospective patients.  Indeed, the first sentence in the brochure reads as follows: "Appearance plays a big role in the lives of most people."  The brochure then goes on to tout the benefits of facial plastic surgery.  It is utterly ludicrous to think that patients contemplating facial plastic surgery would, or even could, purchase from applicant (an organization located solely in Alexandria, Virginia) a sales tool promoting the benefits of facial plastic surgery.  Rather, it is obvious that applicant sells these sales tools to its members (facial plastic surgeons) to assist them in marketing their services.  Thus, these brochures (sales tools) are sold by applicant to its members who in turn distribute them to patients and prospective patients.  The important point to remember is that these sales tools prominently display applicant's mark which is seen by applicant's member facial plastic surgeons.

Second, in a further effort to minimize applicant's $175,000 advertising and promotion budget directed to plastic surgeons, the majority in footnote 5 states that "an unspecified part of applicant's budget [$175,000] is spent on exhibitor prospectuses (whose cost to prepare and to mail is not indicated) mailed to 350 companies (who exhibit at applicant's meetings) four times a year."  In his statement, applicant's Executive Vice President carefully breaks down applicant's $175,000 advertising and promotion budget.  The $175,000 advertising and promotion budget does <u>not</u> include any amount spent on exhibitor prospectuses, which total but a mere 1,500 copies per year.  Rather, the $175,000 advertising and promotion budget is devoted to over 325,000 pieces of literature which prominently feature applicant's mark <u>and</u> which are distributed or sold solely to applicant's members or prospective members, all of whom are plastic surgeons.

In view of the magnitude of applicant's advertising and promotion budget and the fact that applicant has continuously used its mark for 14 years, it comes as no surprise that applicant was able to make of record literally dozens of letters from plastic surgeons stating that they recognize the mark which applicant seeks to register as indicating applicant and the services it provides.  More importantly, applicant's 2,700 members have spoken not just with words, but with

actions. To be more precise, the record is replete with hundreds of Yellow Page advertisements placed by applicant's members which prominently feature the mark applicant seeks to register followed by the TM symbol. Applicant's members, through their actions, have demonstrated that they truly believe that the mark which applicant seeks to register is a vital source identifier which distinguishes them as having met certain minimum qualifications in facial plastic surgery. Indeed, applicant has also made of record dozens of letters from patients who indicate that they selected one of applicant's members based upon the presence of applicant's mark in a Yellow Page advertisement as an indication that the member was indeed affiliated with applicant.

These Yellow Page advertisements placed by applicant's members containing the mark applicant seeks to register are quite powerful evidence showing that applicant's members view this mark as a source identifier for two reasons. First, unlike a newspaper advertisement which may have life of only one or two days, a Yellow Page advertisement has a life of approximately one year. Second, applicant has submitted a survey demonstrating that 82% of those individuals who have had or are likely to have plastic surgery consult the Yellow Pages in seeking a plastic surgeon.

Based on this record in its totality, applicant has clearly established that at least among plastic surgeons, the mark depicted below has become recognized as indicating applicant and the services which it provides to <u>plastic surgeons</u>.

**FACIAL
PLASTIC
SURGERY**

The majority characterizes the above mark as being "clearly nondistinctive." In this regard, it is interesting to view the mark of the ASPRS, the other national organization of plastic surgeons. This mark is reproduced below. Given the fact that the mark of the ASPRS consists of the most basic of geometric designs (a circle) with but two breaks, I presume that the majority would likewise characterize said mark as "clearly nondistinctive." However, a review of the Yellow Page advertisements made of record by applicant demonstrate that members of the ASPRS, like members of applicant, have "put their money where their mouth is" in that both marks appear prominently in literally hundreds of Yellow Page advertisements.



As stated earlier in this opinion, the relevant purchasing public of the services for which applicant seeks to register its mark are plastic surgeons.  The predecessor to our primary reviewing Court has held that physicians are "a highly intelligent and discriminating public." *Warner Hudnut, Inc. v. Wander Co.,* 280 F.2d 435, 126 USPQ 411, 412 (CCPA 1960).  I am of the firm belief that highly intelligent and discriminating plastic surgeons have during the past 14 years come to recognize the mark which applicant seeks to register as indicating applicant and the services which applicant provides to <u>plastic surgeons</u>.  The majority cites numerous cases where generic terms depicted in various stylized manners were denied registration.  However, <u>all</u> of these cases involved consumer products purchased by ordinary Americans who are not as astute and discriminating as are plastic surgeons. Moreover, the purchase of consumer products does not involve nearly the degree of care which plastic surgeons would exercise before joining applicant and partaking of its training and membership services.

As an aside, I also believe, based on this record, that ordinary Americans who have had plastic surgery or are contemplating having plastic surgery have also come to recognize applicant's mark as indicating applicant and as indicating that a particular plastic surgeon is a member of

applicant.  However, whether this latter contention is correct or not is totally irrelevant.  The views of ordinary consumers who have had plastic surgery or who are contemplating having plastic surgery are of no consequence when applicant is seeking to register its mark <u>solely for services directed to plastic surgeons</u>.  Plastic surgeons are the <u>only relevant purchasing public</u> in determining whether applicant's mark functions as a source identifier.  For plastic surgeons, applicant's mark clearly functions as a source identifier for training in plastic facial surgery; promoting the interests of facial plastic surgeons; and indicating membership in an association of facial plastic surgeons.

One final comment is in order.  The majority correctly quotes Professor McCarthy when he states the following:  "The potential competitive danger of such logo registrations of generic names is that the owners of such registrations <u>sometimes</u> have an inflated notion of the scope of their exclusive rights and assert them against competitors as if they owned the generic name displayed in the registration." 2 J. McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> Section 12:40 at page 12-82 (4th ed. 2001) (emphasis added). As Professor McCarthy's statement suggests, to every general rule, there are a few exceptions, and this case presents one of them.  The number of organizations offering training in

facial plastic surgery, promoting the interests of facial plastic surgeons and indicating membership in an association of facial plastic surgeons is extremely limited. Indeed, this very voluminous record indicates that there is but one other organization which provides somewhat similar services. This is the ASPRS whose 5,000 member plastic surgeons do not limit their practice to the face. Should applicant obtain a registration for its mark, I find it absolutely ludicrous to think that applicant could use this registration to frighten the ASPRS or other professional organizations into refraining from using the words "facial plastic surgery," especially when applicant has explicitly disclaimed all rights in these words, and this disclaimer would appear on any registration obtained by applicant. The number of "competitors" of applicant offering the same or similar services for which applicant seeks registration is extremely limited, and by their very nature, these services would be offered only by and to "a highly intelligent and discriminating public." *Warner Hudnut*, 126 USPQ at 412.

The issue before this Board is not whether some 14 years ago applicant's mark was perceived by the relevant purchasing public (plastic surgeons) as a source identifier. Rather, the issue before this Board is whether applicant's mark, in its entirety, now functions as a source identifier to the relevant

purchasing public (plastic surgeons).  *In re Montrachet S.A.,* 878 F.2d 375, 11 USPQ2d 1393, 1394 (Fed. Cir. 1989).  As previously noted, I am of the firm belief that highly intelligent and discriminating plastic surgeons <u>now</u> view applicant's mark in its entirety as a source identifier identifying applicant and its highly specialized services directed solely to plastic surgeons.